Fred S. HAVENICK, et al., On Behalf of
Themselves and All Others Similarly
Situated, Plaintiffs,

v.

NETWORK EXPRESS, INC.,
et al., Defendants.

No. 96–CV–74627–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 1997.

Reed R. Kathrein, San Francisco, CA, Henry Rosen, San Diego, CA, Leigh A. Parker, Los Angeles, CA, Mark Bransdorfer and Stephen C. Bransdorfer, Bransdorfer & Bransdorfer, P.C., Grand Rapids, MI, for plaintiffs.

Raymond Henney, Detroit, MI, Harvey J. Wolkoff, Robert G. Jones, Boston, MA, for the company and individual defendants.

Tom Rafferty, David R. Marriott, Cravath, Swaine & Moore, New York City, Michael Coakley, Miller, Canfield, Paddock and Stone, Detroit, MI, Joel W. Sternman, Rosenman & Colin, LLP, New York City, for underwriter defendants.

*OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS*

ROSEN, District Judge.

## I. INTRODUCTION

On October 7, 1996, Plaintiffs Fred S. Havenick, George L. Leland, and Jacquelyn Leland filed this class action on behalf of themselves and other purchasers of the stock of Defendant Network Express, Inc. ("NEI")[1] between March 13, 1995 and October 6, 1995 (the "Class Period"). NEI and the other Defendants in this action had the following relationships during the Class Period:

1. Defendant Richard P. Eidswick was NEI's President and Chief Executive Officer;

2. Defendant David L. Hartmann was NEI's Executive Vice President and Chief Technical Officer;

3. Defendant David J. Carson was NEI's Vice President of Corporate Development;

4. Defendant Thomas C. Kinnear was a Director of NEI;

5. Defendant Brian Sullivan was a Director of NEI;

6. Defendant Stephen A. Swanson was a Director of NEI; and

7. Furman Selz, L.L.P. and Unterberg Harris, which are each an investment firm and a securities underwriter, co-managed a secondary offering on behalf of NEI.

In their Complaint, Plaintiffs allege that during the Class Period, Defendants NEI, Eidswick, Hartmann, Carson, Kinnear, Sullivan, Swanson, Furman Selz, and Unterberg Harris made false and misleading representations and omissions regarding NEI's business success which artificially inflated NEI's stock price and then led to a precipitous decline once they disclosed more accurate information to the market. Accordingly, Plaintiffs' Complaint includes the following Counts: (1) Violation of 10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all Defendants; and (2) Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against NEI, Eidswick, and Hartmann.

Pursuant to Fed.R.Civ.P. 12(b)(6), Defendants have moved to dismiss Plaintiffs' Complaint, arguing that: (1) the applicable statute of limitations bars Plaintiffs' claims; (2) the Complaint fails to identify any material misstatement or omission to support an actionable claim of securities fraud against any Defendant; and (3) the Complaint fails to plead scienter adequately. Moreover, Defendants contend that under Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u–4(b)(2), the Complaint fails to plead the circumstances of fraud with sufficient particularity. Having reviewed the parties' pleadings and conducted a hearing on this matter, the Court is now prepared to rule. This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

NEI sells integrated services digital network ("ISDN") equipment for high-speed telecommunications. (Complaint, ¶ 1). In mid–1994, NEI became a public company, and by the end of January 1995, its stock was trading at approximately $7–$8 per share on the NASDAQ SmallCap Market. (Complaint, ¶ 29). Thereafter, on March 13, 1995, NEI issued a press release in which Hartmann described NEI's customer base:

> Network Express customers range in size from relatively small shops to large government institutions, but they all share the same goals: to accurately transmit important data images in the fastest most cost-effective and secure manner possible … [NEI] has over 3,000 installations in the US, Japan, and Europe.

(Complaint, ¶ 32). At this time, NEI's stock price had increased to over $15 per share. (*Id.*).

### A. The Corporate Background Document.

On March 15, 1995, NEI announced a secondary public offering of over 2 million shares of its common stock, including stock offered by NEI and certain selling shareholders. (Complaint ¶ 33). At this time, and throughout the remainder of the Class Period, NEI distributed to the market a docu-

---

1. On August 1, 1996, Defendant Cabletron Systems, Inc. acquired all of NEI's outstanding stock.

ment entitled "Corporate Background." (Complaint, ¶ 34). Under the "Company Overview" rubric, the following statements appear:

> NEI is a worldwide leader in the rapidly expanding market of ... ISDN ....[2]
> Utilizing its experience in the demanding Japanese market as a provider of routers and hubs for ISDN, NEI is expanding in the U.S. market, where the Regional Bell Operating Companies (RBOCs) are now deploying ISDN at a fast pace for applications such as telecommunicating, remote access, Internet access, and many more.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The Company is the market leader in Japan, where it first introduced ISDN products in 1992. ISDN has been widely deployed in Japan for many years, and NEI opted to focus on proving its products in that highly quality-conscious market before moving broadly into the U.S. ISDN market.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> As the RBOCs in the U.S. respond to customer demand and deploy ISDN on a wider scale, NEI will provide its proven alternative to slow and expensive conventional modem lines.

(Complaint, ¶ 34).

The Corporate Background document also discusses a new NEI product, the NELink–1000:

> The newest addition to the NE Series, the NELink–1000 is an internetworking product designed for the small central site or remote office using ISDN for the exchange of data, graphic, and image files.
> The NELink–1000 fills two ISDN internetworking needs. As a starter kit at a small central site, the NELink–1000 provides interoperability with the widest array of remote access products. Second, it can be used for multiple users needing remote access to one or more scaleable Network Express NE 2000 II's, 4000's, or 5000's at central cites.

(Complaint, ¶ 35).

Finally, the Corporate Background document provides information regarding NEI's customers:

> NEI customers utilize the NEI ISDN Interhub and NE ISDN Router for a variety of complex networking and communications applications, including telecommuting, video-conferencing, and imaging. Select NEI U.S. customers include:
>
> Access Management
> Apple Computer
> Ameritech
> Bell Atlantic
> Cabletron Systems
> Circuit City
> Comnet
> EDP Communications
> Household International
> Internal Revenue Service
> Michigan State University
> Ncube
> New Jersey State College
> NYNEX
> Pacific Bell
> Real Time Communications
> San Fernando Valley of Realtors
> Silicon Graphics
> Stratacom
> University of Michigan
> U.S. Patent & Trade Office
> Amdahl
> Allen–Bradley
> Bellcore
> Bell Northern Research
> Chrysler Corporation
> Cirrus Logic
> Department of Education
> Fujitsu
> Intel
> LSI Logic
> National Semiconductor
> Netscape Communications
> NIST (National institute of Standards and Technology)
> Perot Systems
> Ross & Hardies
> Sandia National Labs
> Standard & Poor
> Symantec
> U.S. Joint Chiefs of Staff
> U.S. Senate
> William Morris Agency

(Complaint, ¶ 35).

### B.　The Form 10–K Report.

On March 31, 1995, NEI filed with the Securities and Exchange Commission ("SEC"), its Form 10–K for the year ending December 31, 1994. (Complaint, ¶ 36). In

---

**2.** Phrases printed in italics are the statements that Plaintiffs allege are false and/or misleading.

the Introductory section, NEI describes its current Japanese market and the potential market in the United States for its products. (Mar. 31, 1995 Form 10–K, NEI Ex. A, p. 2).

The background section indicates that, in addition to its main office in Michigan, NEI opened, between mid–1994 and early 1995, a small technical support office in Tokyo and sales offices in California, the United Kingdom, and New York, *id.* at pp. 2–3, and further indicates here that during this same time it established two subsidiaries, Network Express K.K. in Japan and Network Express Europe Ltd. *Id.*

The Form 10–K Report includes a Risk Factors section which discusses the business risks that NEI faces. Here, NEI states the following:

> The Company's business is subject to significant risks, including, but not necessarily limited to, the factors set forth below. **Dependence on Single Customer.** In 1992, 1993, and 1994, sales to Soliton Systems, K.K. ("Soliton"), the exclusive distributor of the Company's products in Japan, accounted for approximately 54%, 79%, and 88%, respectively, of the Company's net sales. The Company expects this sales concentration to continue at least through 1995. A majority of such sales are attributable to NE ISDN Router products. Under the Company's agreement with Soliton (the "Soliton Agreement"), Soliton alone may distribute the Company's products in Japan; however, Soliton may sell products of other companies, including those of the Company's competitors ... Further, the Soliton Agreement expires in April 1997 and there can be no assurance that it will be renewed, or, if renewed, that its terms will be as favorable ... Any de-emphasis of the Company's products by Soliton, termination of the Soliton Agreement, modifications to terms less favorable to the Company, or any operational or financial failure of Soliton, could have a material adverse effect on the business, results of operations and financial condition of the Company ...
>
> The Company believes that Soliton is highly dependent on a limited number of customers. Any delays, changes in purchasing patterns, termination of programs or competition could have a material adverse affect on Soliton and, in turn, the Company. There can be no assurance that Soliton or its customers will continue to place orders with the Company. In addition, the sales cycles of the Company's products are relatively long and often dependent upon factors such as the size and timing of Soliton's customer's projects. The Company's planned product shipments for a single customer project can be a significant portion of a quarter's revenue, and delays in the timing or the Company's ability to meet delivery requirements could have a material adverse effect on the Company's results of operations. In addition, decisions by customers to build inventory and sell from inventory could lead to reductions in demand, which could have a material adverse affect on the Company's business, financial condition and results of operations.
>
> **Fluctuations in Quarterly Operating Results.** The Company expects that its quarterly operating results could fluctuate in the future as the result of several factors, including the Company's ability to develop, introduce and ship new products, its mix of products sold, the mix of distribution channels employed, the success of its United States and European sales and marketing initiatives, ... [and] the gain or loss of significant customers ... The Company's dependence on a single customer and its purchasing patterns in Japan also contributes to fluctuations in sales and unpredictability of future orders, and is expected to continue in the future ... [T]he Company has recently reduced prices to Soliton, its largest customer, and committed significant resources to developing a United States and European marketing capability. Consequently, there can be no assurance that the Company will be able to maintain profitability, particularly on a quarter to quarter basis.
>
> **Limited History of Operations and Profitability.** The Company was incorporated in March 1990 and began shipping products in June 1991. As of December 31, 1994, the Company had an accumulated deficit of $2,902,609. The Company has experienced higher levels of revenue on an

annual basis and has been profitable in each of the last four fiscal quarters; however, there can be no assurance that revenue growth or profitability will continue. **Technological Change, New Products and Market Acceptance.** The data communications industry is characterized by rapid and significant technological change, the frequent introduction of new products and services using new technologies and short product life cycles ... The Company's ability to anticipate and respond to changes in technology, industry standards and customer needs and to develop and introduce new (or enhance existing) products on a timely and cost-effective basis will be a significant factor in its competitive position and growth prospects.... There can be no assurance that the Company will be successful in developing, introducing or managing the transition to new or enhanced products or that any such products will be responsive to technological changes or will gain market acceptance in Japan or elsewhere. The Company's business and operating results would be materially and adversely affected if the Company were to be unsuccessful, or to incur significant delays, in developing and introducing such new products or enhancements. In the past, the Company has experienced delays in product release and introduction, and there can be no assurance that such delays will not occur in the future ...

Additionally, if technologies or standards supported by the services of telephone companies using the Company's products, or the products themselves, become obsolete or fail to gain widespread commercial acceptance, the Company's business may be adversely affected. Moreover, complex products such as those offered by the Company may contain undetected or unresolved software errors when they are first introduced or as new versions are released. There can be no assurance that, despite extensive testing by the Company, software errors will not be found in new products or upgrades after commencement of commercial shipments, resulting in delay or loss of market acceptance. Future delays in the introduction or shipment of new or enhanced products, the inability of such products to gain market acceptance or problems associated with new product transitions could adversely affect the Company's operating results.

\*    \*    \*    \*    \*    \*

**International Operations: Historical Reliance on Sales in Japan.** International sales accounted for approximately 79%, 79%, and 88% of the Company's net sales in 1992, 1993, and 1994, respectively. Substantially all of these net sales were in Japan. The Company expects this sales concentration to continue at least throughout 1995. Although the Company's near-term business strategy involves a commitment to developing the market in the United States, the long-term business strategy involves not only a continued focus on the market in Japan, but also a concerted effort in developing the market in Europe.

\*    \*    \*    \*    \*    \*

**Limited Sales and Distribution in the United States and Europe.** The Company's United States distribution arrangements have to date been relatively limited and largely reliant on the sale of products to, and through, telephone companies. In the fourth quarter of 1994, the Company hired a new Vice President, Sales and Marketing, who has, in turn, increased the United States sales and marketing staff from eight to 14 persons. There can be no assurance that the Company's efforts to increase United States sales will be successful or that increased costs expected in 1995 as a result of this initiative will not adversely affect the Company's results of operations if revenues in the United States are not sufficient to meet the additional costs. In Europe, the Company has a nonexclusive distributor agreement with Telonic Gmbh to distribute the Company's products in Germany and has recently opened an office in the United Kingdom to serve as a sales office for Europe. The foreign distribution arrangements so-far established by the Company are not guaranteed to continue or expand, and the Company's success will depend upon its ability to identify suitable distributors in

other markets, to negotiate satisfactory arrangements with them, and to maintain those arrangements.

**Volatility of Stock Price.** The trading price of the Common stock has been and could be subject to wide fluctuations in response to quarterly variations in the Company's operating. results, shortfalls in such operating results from levels forecast by securities analysts, announcements of technological innovations or new products by the Company or its competitors and other events or factors....

(Mar. 31, 1995 Form 10–K, NEI Ex. A, pp. 3–9) (**emphasis** in the original).

The Form 10–K Report also describes NEI's various products, including the NELink–1000:

*The Company announced the introduction of the NELink–1000 in March 1995. Resulting from the Company's product strategy, the NELink–1000 is an internetworking product designed for the small central site or remote location. It interoperates with a wide range of ISDN remote access products and Switched 56 LAN access devices, including terminal adapters, workstations, bridges and routers.* The benefits of the NELink–1000 include performance ... reliability ... manageability, security, flexibility ... and economy. *Several applications of the NELink–1000 include telecommuting, Internet access, remote office connectivity, multimedia, remote X/terminals and video conferencing.*

*The NELink–1000 utilizes a different platform than the Company's larger products, and is the first product offered by the Company that is designed solely as a telecommunications device. Its physical characteristics were chosen to facilitate placement on a desktop or shelf in recognition that its targeted installation is at smaller remote sites, including remote workstations utilized by individual telecommuters ....*

(Mar. 31, 1995 Form 10–K, NEI Ex. A, p. 11).

With respect to sales and marketing, the Form 10–K Report states that:

The Company's sales and marketing efforts in Japan, its largest market, are conducted through Soliton, the Company's exclusive Japanese distributor. In the fourth quarter of 1994, the Company expanded its United States sales force from seven to 14 persons. The Company maintains a sales office in the United Kingdom which is responsible for European sales, and has entered into an agreement for the distribution of its products in Germany. Thus far, sales in the United States and Europe have not been significant to the Company's results of operations.

Japan. *The Company believes it is the leading supplier of ISDN internetworking solutions in Japan. The Company sold its first routers there in 1992 and the market has expanded rapidly since that time. The Company's marketing partner and exclusive distributor, Soliton, has developed customers and has installed more than 2,500 of the Company's systems across several industries, including manufacturing, telecommunications, retail banking and engineering ... In 1994, the Company, through Soliton, began to work on larger network applications that will use the NE ISDN InterHub products to provide access by telephone companies and banks to large numbers of remote locations using ISDN. Competitors ... [are] also expanding their product offerings in this area. See "Risk Factors— Dependence on Single Customer."*

United States. *In the United States, the Company has developed customers in several industries and, with the market for ISDN steadily growing through the deployment of the network infrastructure, the Company expects this trend to continue.* These customers include the federal government and companies involved in semiconductors, research and development, software, financial services, manufacturing, computer, education, realty, high tech, industrial communications, automotive and publishing. The Company's products are used in many applications, including telecommuting, access to the Internet, graphics/pre-press production and video-conferencing.

Due to its past focus on the Japanese market and in part to the relatively recent emergence of ISDN connectivity in the United States, the Company's United States distribution arrangements have been relatively limited, and substantially reliant upon selling products to and through telephone companies and others. The Company's United States sales strategy is to focus on enhancing relationships with telecommunications carriers, value-added resellers and potential original equipment manufacturers, while continuing and expanding upon existing relationships with large government users of internet-working and Fortune 100 corporations.

Europe. The Company's European sales strategy is to continue the process of homologation, or certification of its products, in the European countries. In September 1994, the company established a sales office in the United Kingdom which will assist in the process of homologation. The Company plans to use distributors in connection with the sale of its products in Europe and, to that end, the Company appointed its first European distributor, Telonic, which, pursuant to an agreement dated August 1, 1993, has been granted marketing rights in Germany and has been appointed a master software distributor with a right to sub-license.

*Id.* at pp. 12–13.

### C. The 1994 Annual Report to Shareholders.

In early April 1995, NEI distributed its 1994 Annual Report to Shareholders. (Complaint, ¶ 37). The Table of Contents page declares that: "NEI's initial focus was Japan, where ISDN is widely available. As the Regional Bell Operating Companies (RBOCs) deploy ISDN more extensively in the U.S., NEI is expanding domestic marketing efforts and introducing new products." (NEI's 1994 Annual Report to Shareholders, Furman Selz and Unterberg Harris' Ex. I).

The Annual Report included a letter to shareholders in which NEI's President and CEO Richard Eidswick stated:

*I am very proud to report on the achievements of Network Express in the past year. The Company made excellent progress in all major areas of the business. Financial results were excellent.* Sales rose 176 percent to $11.1 million from $4 million in 1993. Net income was $466,000, or $.07 per share, compared with a net loss of $900,000, or $.21 per share, a year ago. Sales to customers in Japan made up 88 percent of total revenue in 1994.

\* \* \* \* \* \*

In Japan, we have a close working relationship with Soliton, our sole distributor and partner in that market. We concentrated on the Japanese market early in the growth of our business since ISDN was widely available from the Japanese telephone company when we began selling products in 1992.

Now, *ISDN is becoming more fully deployed in the U.S. and European markets through the Regional Bell Operating Companies (RBOCs) and European telephone companies. We have positioned our business to take advantage of this proven technology.* Our marketing and sales strategies to attain results in the U.S. market are outlined in this report.

\* \* \* \* \* \*

*Our products' performance and capabilities have been proven in the demanding, quality-conscious and competitive Japanese market since 1992. We expect continued growth in the Japanese market as we begin to open markets in the U.S. and Europe as ISDN technology becomes more widely available.*

*Telephone companies are deploying ISDN in many areas of the U.S. and Europe and our strategy is to continue to work closely with them, to sell directly to serve customers and to extend the sales effort in our distributor network to give us broader coverage of the market.*

The people at Network Express appreciate the confidence of our investors and customers. *This is an exciting time for your Company and I look forward to reporting to you on our progress throughout the year.*

(NEI 1994 Annual Report Furman Selz and Unterberg Harris' Ex. I, pp. 2–3).

The 1994 Annual Report also provides some background regarding the deployment of ISDN technology. *Id.* at p. 4.

The next section describes NEI's geographic markets:

**Japan**

*Network express is a leader in ISDN internetworking solutions in Japan. NEI sold its first routers there in 1992 and the market has expanded rapidly since that time. In 1994, 88 percent of revenue was generated by NEI products sold in Japan.*

\* \* \* \* \* \*

*NEI's Japanese marketing partner and distributor, Soliton Systems K.K., has developed a customer base and has more than 2,500 systems installed at customer sites across several industries—manufacturing, telecommunications, retail, banking and engineering.*

*Customers are using NEI products in mission-critical ISDN networks. Applications range from client/server networks for accounting and administration systems to engineering networks that connect remote laboratories. Hundreds of NEI systems are linked in some networks. Other systems use a central-site solution to connect networks.*

*In 1994, NEI began working with Soliton on larger network applications that will use the InterHub products to provide access to hundreds of remote locations using ISDN.*

**North America**

*With the U.S. market for ISDN growing steadily through deployment of the network infrastructure, NEI has developed customers in several industries. They include federal government, semiconductor, research, software, financial services, manufacturing, computer, education, realty, engineering, industrial communications, automotive and publishing.*

\* \* \* \* \* \*

Sales to U.S. customers take place through different marketing channels. NEI's direct sales force works with telephone companies and other target prospects. Sales people also develop new accounts for mas-ter value-added resellers and distributors who then work directly with customers. *The sales and marketing team is expanding rapidly to meet the growing demand in the U.S. market.*

**Europe**

*ISDN is widely available through telephone companies in several European nations, including Germany, France and England. To take advantage of this established infrastructure, the Company began European operations by establishing a London office in 1994. Sales and support people are developing new customers and organizing a European distributor network.*

NEI is targeting the largest companies in Europe and is also developing strategic relationships with phone companies and certain other customers. Applications include InterHubs for Internet access and work-at-home applications as well as Router networks.

(1994 Annual Report, Furman Selz and Unterberg Harris' Ex. I, pp. 5–6).

The Annual Report also highlights NEI's products:

*Network Express is taking advantage of the growth that is occurring in the worldwide ISDN market. The Company expects to benefit from the emerging wave of internetworking in which LAN–to–LAN communications are becoming important to many computer users.*

\* \* \* \* \* \*

*The Company has a range of products, known as the NE series, that fits the needs of both large and small networks. The NE ISDN Router and the NE ISDN InterHub are software products that run across a group of hardware platforms called the NE 2000–II, NE 4000 and NE 5000.*

*The NELink–1000, scheduled to be released this Spring, is a fully integrated internetworking device. It is designed for central sites or remote offices getting started with ISDN internetworking. The*

*NELink–1000 provides economical inter-networking access for the remote sites.*

*Id.* at pp. 6–7.

With respect to manufacturing, the Annual Report states that:

*The Company's strategy is to design products based on market needs and then to use well-qualified suppliers to assemble, burn in and test all components and sub-assemblies. Two of the Company's key suppliers for the outsourcing are Pioneer–Standard Electronics, Inc., of Cleveland, OH and Adco Circuits of Rochester Hills, MI. Products are then tested for quality standards, assembled and shipped under Network Express control.*

*The policy of integrating products rather than manufacturing them allows more focus on customer needs by delivering high quality products without investing in capital intensive manufacturing equipment.*

*Id.* at p. 7.

### D. *The Prospectus.*

Pursuant to its May 18, 1995 Secondary Offering, NEI sold 2.2 million shares and Eidswick, Hartmann, Carson, Kinnear, Sullivan, and Swanson sold, in total, 600,000 shares of their own. (Complaint, ¶ 42). The price to the public for these shares was $13.25 per share. (*Id.*). Incident to the Secondary Offering, NEI and Furman Selz and Unterberg Harris filed with the SEC an April 23, 1995 preliminary prospectus and a May 18, 1995 final prospectus (collectively referred to as the "Prospectus" as they contain the same statements). (Complaint, ¶¶ 40, 42).

On the front page, the Prospectus states in bold print that "The Common Stock offered hereby involves a high degree of risk. *See* 'Risk Factors.'" (May 18, 1995 Prospectus, NEI Ex. B, p. 1). Thereafter, a summary of the Prospectus is provided:

*The following summary is qualified in its entirety by the more detailed information and the consolidated financial statements and notes thereto found elsewhere in this Prospectus ... Prospective investors are advised to devote particular attention to the text under "Risk Factors."*

\* \* \* \* \* \*

The Company offers two core product families, which together are known as the NE Series: (a) the NE ISDN Router ... and (b) the NE ISDN InterHub ...

\* \* \* \* \* \*

The Company's core software technology is embodied in an architecture to address the special needs of dial-up ISDN internetworking involving transparent bandwidth management, security, interoperability and call management. The principal market for the Company's products to date has been large corporations in Japan, where ISDN has been fully deployed for some time. A principal component of the Company's business strategy, however, is to expand sales in the United States, where the deployment of ISDN has been relatively slow, but more recently has begun to increase. The Company believes that its experience in meeting the needs of large corporations in Japan gives it a competitive advantage as it is able to offer its customers products of proven functionality and performance. As of March 31, 1995, the Company had sold over 3,600 units, 3,300 of which were sold in Japan.

*Id.* at p. 3 (*emphasis* in original).

The Prospectus then lists Risk Factors which it advises *"should be considered carefully in addition to the other information contained in this Prospectus before purchasing the Common Stock offered hereby." Id.* at p. 5 (*emphasis* in original). These Risk Factors, which are very similar to those that NEI identified in its March 31, 1995 Form 10–K, include:

**Dependence on Single Customer.** In 1992, 1993, and 1994, sales to Soliton Systems, K.K. ("Soliton"), the exclusive distributor of the Company's products in Japan, accounted for approximately 54%, 79%, and 88%, respectively, of the Company's net sales (and approximately 93% of net sales in the first quarter of 1995). A majority of such net sales are attributable to NE ISDN Router products. The Company expects this sales concentration to

continue at least throughout 1995. These products accounted for 76% and 78% of net sales in 1993 and 1994, respectively, and are expected to decrease in future periods as a percentage of the Company's net sales. Under the Company's agreement with Soliton (the "Soliton Agreement"), Soliton alone may distribute the Company's products in Japan; however, Soliton may sell products of other companies, including those of the Company's competitors ... Further, the Soliton Agreement, as amended effective April 1, 1995, expires in April 1997 and there can be no assurance that it will be renewed, or, if renewed, that its terms will be as favorable ... Any de-emphasis of the Company's products by Soliton, termination of the Soliton Agreement, modifications to terms less favorable to the Company, or any operational or financial failure of Soliton, could have a material adverse effect on the business, results of operations and financial condition of the Company. Soliton, itself, is the manufacturer of certain competing products directed at workstation ISDN access. See "Business—Sales and Marketing."

The Company believes that Soliton is highly dependent on a limited number of customers, including one customer, Nippon Telephone & Telegraph ("NTT"), which accounted for over 50% of Soliton's revenue in 1994. Any delays, changes in purchasing patterns, termination of programs or competition could have a material adverse affect on Soliton and, in turn, the Company. There can be no assurance that Soliton or its customers will continue to place orders with the Company. In addition, the sales cycles of the Company's products are relatively long and often dependent upon factors such as the size and timing of Soliton's customer's projects. The Company's planned product shipments for a single customer project can be a significant portion of a quarter's revenue, and delays in the timing or the Company's ability to meet delivery requirements could have a material adverse effect on the Company's results of operations. In addition, decisions by customers to build inventory and sell from inventory could lead to reductions in demand, which could have a material adverse affect on the Company's business, financial condition and results of operations.

**Limited History of Operations and Profitability.** The Company was incorporated in March 1990 and began shipping products in June 1991. As of December 31, 1994, the Company had an accumulated deficit of $2,909,609. The Company has experienced higher levels of revenue on an annual basis and has been profitable in each of the last four fiscal quarters; however, there can be no assurance that revenue growth or profitability will continue. See "Management's Discussion and Analysis of Results of Operations and Financial Condition."

**Technological Change, New Products and Market Acceptance.** The data communications industry is characterized by rapid and significant technological change, the frequent introduction of new products and services using new technologies and short product life cycles ... The Company's ability to anticipate and respond to changes in technology, industry standards and customer needs and to develop and introduce new (or enhance existing) products on a timely and cost-effective basis will be a significant factor in its competitive position and growth prospects.... There can be no assurance that the Company will be successful in identifying, managing, developing, manufacturing or marketing product enhancements or new products that respond to technological change or evolving industry standards, that the Company will not experience difficulties that could delay or prevent the successful development, introduction or marketing of such products, or that its new products and product enhancements will adequately meet the requirements of the marketplace and achieve market acceptance in Japan or elsewhere. The Company's business and operating results would be materially and adversely affected if the Company were to be unsuccessful, or to incur significant delays, in developing and introducing such new products or enhancements. The Company introduced the NELink–1000 in March 1995 to meet

perceived market demand in Japan for a product designed solely as a telecommunications device. There can be no assurance that the NELink–1000 will adequately meet the requirements of the marketplace and achieve market acceptance in Japan or elsewhere. In the past, the Company has experienced delays in product release and introduction, and there can be no assurance that such delays will not occur in the future . . .

Additionally, if technologies or standards supported by the services of telephone companies using the Company's products, or the products themselves, become obsolete or fail to gain widespread commercial acceptance, the Company's business may be adversely affected. Moreover, complex products such as those offered by the Company may contain undetected or unresolved software errors when they are first introduced or as new versions are released. There can be no assurance that, despite extensive testing by the Company, software errors will not be found in new products or upgrades after commencement of commercial shipments, resulting in delay or loss of market acceptance. Future delays in the introduction or shipment of new or enhanced products, the inability of such products to gain market acceptance or problems associated with new product transitions could adversely affect the Company's operating results.

**Need to Expand Product Offering**. . . . A majority of the Company's net sales are attributable to NE ISDN Router products sold in Japan. These products accounted for 76% and 78% of the net sales in 1993 and 1994, respectively, and are expected to decrease in future periods as a percentage of the Company's net sales. Because of differences in LAN configurations between the United States and Japan and market preferences for interoperable products in the United States, the Company believes that sales in the United States, should such market develop, will be largely dependent upon NE ISDN InterHub products. Such products have not to date accounted for a significant percentage of sales in Japan or elsewhere.

The Company believes that its product offerings must be increased to offer products for the large end-user segment of the market which includes scaling up product connectivity and functionality and scaling down to accommodate single user remote sites, such as those found in organizations where telecommuting is important. . . . There can be no assurance that the Company's scale-up/scale-down plans will be successful, or that the efforts currently underway or planned will be accomplished at reasonable cost. The failure to successfully implement this strategy could have a material adverse effect on the Company's ability to develop meaningful United States sales and could adversely affect the Company's business, operations and financial condition. See "Business—Business Strategy" and "Business—Sales and Marketing."

**Fluctuations in Quarterly Operating Results.** The Company expects that its quarterly operating results will fluctuate in the future as the result of several factors, including the Company's ability to develop, introduce and ship new products, . . . the success of its United States and European sales and marketing initiatives, . . . market acceptance of new or enhanced versions of the Company's products, . . . [and] the gain or loss of significant customers . . . The Company's dependence on a single customer in Japan and such customer's purchasing also contributes to fluctuations in sales and unpredictability of future orders, and is expected to continue in the future. . . . All of the foregoing factors are difficult for the Company to forecast, and these and other factors can materially and adversely affect the Company's business and operating results for one quarter or for a series of quarters. The Company receives a limited number of large purchase orders from its major customer, which in turn, is reliant on purchase orders from its major customers. . . . If sales are below expectations in any given quarter, the adverse impact of the shortfall on the Company's operating results may be magnified by the Company's inability to adjust spending to compensate for the shortfall. The Company may also reduce prices or

increase spending in response to competition or to pursue new market opportunities. In this regard, the Company has recently reduced prices to Soliton, its largest customer, and committed significant resources to developing a United States and European marketing capability. Consequently, there can be no assurance that the Company will be able to maintain profitability, particularly on a quarter to quarter basis.

\* \* \* \* \* \*

**Limited Sales and Distribution in the United States and Europe.** The Company's United States distribution arrangements have to date been relatively limited and largely reliant on the sale of products to, and through, telephone companies. In the fourth quarter of 1994, the Company hired a new Vice President, Sales and Marketing, who has, in turn, increased the United States sales and marketing staff from eight to 14 persons. There can be no assurance that the Company's efforts to increase United States sales will be successful or that increase costs expected in 1995 as a result of this initiative will not adversely affect the Company's results of operations if revenues in the United States are not sufficient to meet the additional costs. In Europe, the Company has a non-exclusive distributor agreement with Telonic Gmbh to distribute the Company's products in Germany and has recently opened an office in the United Kingdom to serve as a sales office for Europe. The foreign distribution arrangements so-far established by the Company are not guaranteed to continue or expand, and the Company's success will depend upon its ability to identify suitable distributors in other markets, to negotiate satisfactory arrangements with them, and to maintain those arrangements.

\* \* \* \* \* \*

**International Operations; Historical Reliance on Sales in Japan.** International sales accounted for approximately 79%, 79%, and 88% of the Company's net sales in 1992, 1993, and 1994, respectively (and approximately 93% of net sales in the first quarter of 1995). Substantially all of these net sales were in Japan. The Company expects this sales concentration to continue at least through 1995. Although the Company's near-term business strategy involves a commitment to developing the market in the United States, the long-term business strategy involves not only a continued focus on the market in Japan, but also a concerted effort in developing the market in Europe.

\* \* \* \* \* \*

**Shares Eligible for Future Sale.** Sales of substantial amounts of Common Stock in the public market after this offering could adversely affect prevailing market prices for the Common Stock ... Taking into account restrictions imposed by the Securities Act of 1933 (the "Securities Act"), rules and regulations promulgated thereunder and lock-up agreements between certain shareholders of the Company and the representatives of the Underwriters [, Furman Selz and Unterberg Harris,] the number of shares that will be available for sale in the open market ... will be as follows: (i) 7,765,412 shares will be eligible for immediate sale; and (ii) approximately 1,057,020 shares will be eligible for sale beginning 120 days after the date of this Prospectus....

\* \* \* \* \* \*

**Volatility of Stock Price.** The trading price of the Common stock has been and could be subject to wide fluctuations in response to quarterly variations in the Company's operating results, shortfalls in such operating results from levels forecast by securities analysts, announcements of technological innovations or new products by the Company or its competitors and other events or factors....

(May 18, 1995 Prospectus, NEI Ex. B, pp. 5–11).

The Prospectus contains a separate section which discusses NEI's net sales:

... Net sales increased 187% from $1.4 million in 1992 to $4.0 million in 1993 and increased 176% to $11.1 million in 1994. Sales of the Company's products in Japan represented $1.1 million, or 79% of net

sales in 1992, $3.2 million, or 79% of net sales in 1993, and $9.8 million, or 88% of net sales in 1994, with the balance in each year derived primarily from the United States ...

\* \* \* \* \* \*

Sales in Japan, which since September 1992 have resulted solely from Soliton purchase orders, have increased in every quarter during the past two years. For the fourth quarter of 1994, sales to Japan were approximately $3.5 million, which represented approximately 35% of total Japanese sales for the year.... A majority of net sales ... are attributable to NE ISDN Router products. These products accounted for 76% and 78% of net sales in 1993 and 1994, respectively, and are expected to decrease in future periods as a percentage of the Company's net sales.

\* \* \* \* \* \*

... In the United States, sales comprised 21%, 20% and 12% of net sales in 1992, 1993 and 1994, respectively. Sales in Europe have not been significant.

\* \* \* \* \* \*

**Quarters Ended March 31, 1994 and 1995**

... Net sales increased 138% from $1.9 million in the quarter ended March 31, 1994 to $4.5 million in the quarter ended March 31, 1995. Sales of the Company's products in Japan represented $1.7 million or 89% of net sales in the quarter ended March 31, 1994, and $4.2 million or 93% of net sales in the quarter ended March 31, 1995, with the balance in each quarter being derived primarily from the United States. The overall sales increase resulted from customer acceptance and continued deployment of the Company's products, new software releases and Soliton's success in penetrating the Japanese market.

*Id.* at pp. 15–16.

With respect to NEI's business strategy, the Prospectus states that:

*Maintain and Leverage Strong Position in Japan*

... The Company believes that its early focus on Japan has given it the opportunity to demonstrate the functionality of its products in a mature market for ISDN communications which will enhance its position in selling its products as proven performers in other markets, including the United States and Europe ...

A majority of the Company's net sales are attributable to NE ISDN Router products sold in Japan. These products accounted for 76% and 78% of net sales in 1993 and 1994, respectively, and are expected to decrease in future periods as a percentage of the Company's net sales. Because of differences in LAN configurations between the United States and Japan and market preferences for interoperable products in the United States, the Company believes that sales in the United States, should such market develop, will be largely dependent upon NE ISDN InterHub products ...

*Increase United States and European Penetration*

Since its inception, the Company's sales efforts have been primarily focused on Japan and, as a result, sales in the United States and Europe have not been significant, accounting for approximately 12% and less than 1%, respectively, of the Company's net sales in 1994. A key component of the Company's business strategy is to develop these markets. Efforts ... will be directed to securing relationships with the [Regional Bell Operating Companies], strategic value-added resellers of computer products to businesses, large end-users and potential original equipment manufacturers and to emphasizing the scalability of the Company's products for purposes of addressing the perceived needs of the United States market....

*Id.* at p. 24.

Regarding the NELink–1000, the Prospectus states that:

*The Company introduced the NELink–1000 in March 1995. Resulting from the Company's scalable product strategy, the NELink–1000 is an internetworking product designed for the small central site or remote location. It interoperates with a wide range of ISDN remote access products and Switched 56 LAN access devices, including terminal adapters, workstations and routers ... Several potential applica-*

*tions of the NELink–1000 include telecommuting, Internet access, remote office connectivity, multimedia, remote X/terminals and videoconferencing.*

*The NELink–1000 utilizes a different hardware platform than the Company's larger products, and is the first product offered by the Company that is designed solely as a telecommunication device. Its physical characteristics were chosen to facilitate placement on a desktop or shelf in recognition that its targeted installation is at smaller sites, including remote workstations utilized by individual telecommuters.*

*Id.* at p. 28.

The Sales and Marketing section of the Prospectus describes the past, present, and future of NEI's endeavors in Japan, the United States, and Europe:

> Since September 1992, the Company's sales and marketing efforts in Japan, its largest market, have been conducted through Soliton, the Company's exclusive Japanese distributor. In December 1994, the Company hired a new Vice President, Sales and Marketing, who has, in turn, increased the United States sales and marketing staff from eight to 20 persons, to begin the Company's first concentrated effort on developing sales in the United States. The Company maintains a sales office in the United Kingdom employing two sales persons which is responsible for European sales, and has entered into an agreement for the distribution of its products in Germany. Thus, far sales in the United States and Europe have not been significant to the Company's results of operations, accounting for approximately 12% and less than 1%, respectively, of the Company's net sales in 1994.
>
> Japan. The Company believes it is the leading supplier of ISDN internetworking solutions in Japan. The Company sold its first routers there in 1992 and the market has expanded rapidly since that time. The Company's marketing partner and exclusive distributor, Soliton, has developed customers and has installed more than 3,000 of the Company's units across several industries, including manufacturing, telecommunications, retail banking and engineering . . .
>
> In 1992, the Company entered into the Soliton Agreement, pursuant to which Soliton has been granted the exclusive right to sell the Company's products in Japan. The Soliton Agreement, as amended effective April 1, 1995, expires in April 1997, but is automatically renewed for one-year periods if not terminated by either party by notice delivered at least three months prior to the expiration of the current term or any extension thereof . . .
>
> Soliton . . . currently sells products that may be competitive with the Company's products . . . In addition Soliton itself is the manufacturer of certain competing products . . . Sales in Japan normally rise upon Soliton's receipt of a purchase commitment from its own distributor or customer. These sales are recorded upon shipment from the Company or drop shipment from the Japanese assembler, with payment to the Company due 45 days after the shipping date. As of March 31, 1995, the Company had sold and delivered approximately 3,300 units in Japan . . .

The Company believes that Soliton is highly dependent on a limited number of customers, including one customer, NTT, which accounted for over 50% of Soliton's revenue in 1994. Any delays, changes in purchasing patterns, termination of programs or competition could have a material adverse affect on Soliton and, in turn, the Company. There can be no assurance that Soliton or its customers will continue to place orders with the Company. In addition, the sales cycles of the Company's products are relatively long and often dependent upon factors such as the size and timing of Soliton's customer's projects. The Company's planned product shipments for a single customer project can be a significant portion of a quarter's revenue, and delays in the timing or the Company's ability to meet delivery requirements could have a material adverse effect on the Company's results of operations. In addition, decisions by customers to build inventory and sell from inventory could lead to reductions in demand, which could have a

material adverse affect on the Company's business, financial condition and results of operations.

United States. *In the United States, the Company has developed customers in several industries and, with the market for ISDN steadily growing through the deployment· of the network infrastructure, the Company expects this trend to continue. These customers include the federal government and companies involved in semiconductors, research and development, software, financial services, manufacturing, computer, education, realty, high tech, industrial communications, automotive and publishing.* The Company's products are used in many applications, including telecommuting, access to the Internet, graphics/pre-press production and videoconferencing.

Due to its past focus on the Japanese market and in part to the relatively recent emergence of ISDN connectivity in the United States, the Company's United States distribution arrangements have been relatively limited, and substantially reliant upon selling products to and through telephone companies and others. In addition, the cost of dedicated leased lines in the United States is low and competitive with that of dial-up services, and this is expected to inhibit the demand for such services and, hence, for the Company's products relative ·to the international market. The Company's United States sales strategy is to focus on enhancing relationships with telecommunications carriers, value-added resellers and potential original equipment manufacturers, while continuing and expanding upon existing relationships with large government users of internetworking and Fortune 1000 corporations. To that end, the Company recently entered into an agreement with Intellicom Solutions, Inc., a subsidiary of Intelligent Electronics, pursuant to which Intellicom has agreed to distribute the Company's products. There can be no assurance that this agreement will significantly affect realization of the Company's United States sales and marketing strategy.

Europe. The Company's European sales strategy is to continue the process of homologation, or certification of its products, in the European countries. In September 1994, the company established a sales office in the United Kingdom which will assist in the process of homologation. The Company plans to use distributors in connection with the sale of its products in Europe and, to that end, the Company appointed its first European distributor, Telonic, which, pursuant to an agreement dated August 1, 1993, has been granted marketing rights in Germany and has been appointed a master software distributor with a right to sub-license.

(May 18, 1995 Prospectus, NEI Ex. B, pp. 29–31).

Finally, in the "Technological Change, New Products and Market Acceptance" Section, the Prospectus discusses the NELink–1000:

New product introductions could contribute to quarterly fluctuations in operating results as orders for new products commence and orders for existing products decline. In addition, the Company has shipped and may continue to ship products with a commitment to upgrade such products. There can be no assurance that the Company will be successful in identifying, managing, developing, manufacturing or marketing product enhancements or new products that respond to technological change or evolving industry standards, that the Company will not experience difficulties ·that could delay or prevent the successful development, introduction or marketing of such products, or that its new products and product enhancements will adequately meet the requirements of the marketplace ·and achieve market acceptance in Japan or elsewhere. The Company's business and operating results would be materially and adversely affected if the Company were to be unsuccessful, or to incur significant delays, in developing and introducing such new products or enhancements. . . . There can be no assurance that the NELink–1000 will adequately meet the requirements of the marketplace and achieve market acceptance in Japan or

elsewhere. In the past, the Company has experienced delays in product release and introduction, and there can be no assurance that such delays will not occur in the future....

Additionally, if technologies or standards supported by the services of telephone companies using the Company's products, or the products themselves, become obsolete or fail to gain widespread commercial acceptance, the Company's business may be adversely affected. Moreover, complex products such as those offered by the Company may contain undetected or unresolved software errors when they are first introduced or as new versions are released. There can be no assurance that, despite extensive testing by the Company, software errors will not be found in new products or upgrades after commencement of commercial shipments, resulting in delay or loss of market acceptance. Future delays in the introduction or shipment of new or enhanced products, the inability of such products to gain market acceptance or problems associated with new product transitions could adversely affect the Company's operating results.

*Id.* at pp. 34–35.

### E. The "Roadshow."

Between May 1, 1995 and May 15, 1995, NEI, Eidswick, Hartmann, Furman Selz and Unterberg Harris conducted a "Roadshow" in major U.S. cities (including New York, Chicago, Detroit, and San Francisco). (Complaint, ¶ 41). During the Roadshow, these Defendants met with and made presentations to existing NEI shareholders, institutional investors, securities analysts and potential purchasers of NEI stock. (*Id.*). During these meetings and presentations, Eidswick and Hartmann stated that:

☐ *NEI's business in Japan was strong and, based on that strength, NEI expected its revenues from Japan to remain strong and increase over the next few years.*

☐ *NEI's business in the United States was succeeding, it was expanding its sales and marketing staff to meet the growth in the United States, and NEI*

*expected its United States revenues to increase greatly in 1995 and 1996 to $3 million and $11 million, respectively.*

☐ *NEI's business in Europe was succeeding and NEI expected its European revenues to expand greatly in 1996 to at least $2.5 million.*

☐ *NEI's newest product, the NELink–1000, was a terrific success, in part, because of its remote access capabilities.*

☐ *NEI expected strong sequential revenue and earnings growth throughout 1995 and 1996, with earnings per share reaching $.24–$.26 and $.37 per share, respectively.*

(Complaint, ¶ 41).

### F. The Unterberg Harris June 1, 1995 Research Report.

On June 1, 1995, Unterberg Harris issued a Research Report on NEI which NEI reviewed and approved prior to its release and which NEI subsequently copied and distributed to the public. (Complaint, ¶ 43). Here, Unterberg Harris provided the following revenue analysis of NEI:

| EPS | FY95E | FY96E |
|-----|-------|-------|
| Q1 | $0.05A | $0.06E |
| Q2 | $0.05E | $0.07E |
| Q3 | $0.06E | $0.11E |
| Q4 | $0.07E | $0.14E |
| Year | $0.24E | $0.38E |

Unterberg Harris June 1, 1995 Report, Furman Selz and Unterberg Harris' Ex. C, p. 5.

In the Company Background section, Unterberg Harris states that:

Through a strong relationship with Soliton Systems, a significant systems integrator in Japan, Network Express is a leading provider of ISDN product to the Japanese market and has been extremely successful in developing long-term relationships with many large Japanese companies and the telephone company—NTT. Soliton is the Company's exclusive distributor in Japan, and sold and serviced approximately $9.8 million of products in Japan in 1994, up from approximately $3.0 million in 1993. NTT, the country's largest telephone company, and one of the largest companies in the world, is a strong believer in Network

Express' quality, service and technology and we believe will continue to be a strong buyer of Network Express products.

*While Japan has been the Company's primary focus to date (between 80% and 90% of total sales), with increased interest by U.S. and European telephone companies to deploy ISDN for both corporate and home use, and with the changing needs of remote users who now require high-speed data transfer and Internet access, Network Express is poised to take advantage of the rapidly growing ISDN market both in the U.S. and Europe. Although we expect Japanese ISDN needs to double in the next three years—and Network Express/Soliton should manage to dominate this growth—we forecast that successful penetration of the U.S. and European markets will cause Japanese sales as a percentage of total Company sales to decrease progressively in 1996 and beyond.*

*Id.* at p. 5.

In the following section of the Report, Unterberg Harris describes the ISDN technology and what is necessary to deploy it:

ISDN can only be used once a carrier installs the necessary technology in the central office and the appropriate equipment is bought by the user. NTT—the Japanese Telephone company—began installing ISDN extensively nearly 5 years ago. Today, most Japanese telephone lines can accommodate ISDN interfaces. Network Express was one of the companies selected by NTT to provide customer end equipment.

The pace has been slower in the United States. . . .

*The Regional Bell Operating Companies (RBOCs) are responding. Today nearly 80% of U.S. telephone line can accommodate ISDN end-line equipment; 100% accommodation is not far off. Demand for ISDN equipment in the United States is poised for an explosion and Network Express is gearing up to penetrate this market opportunity.*

*Id.* at pp. 6–7.

The Market Growth section of the Report contains the following statements:

**United States—finally turning towards ISDN**

Most estimates indicate that the number of Basic Rate ISDN lines in the United States in 1994 was approximately 300,000. It is estimated that the growth in BRI lines in the United States will be approximately 70% this year. We are in the early stages of a market that only developed in the last two years as the phone companies began to offer the service widely.

*The U.S. market is expected to grow from approximately 255,000 lines in 1994 to 434,000 lines in 1995, a 70% growth rate. This growth rate should accelerate between 80% and 90% for 1996 and 1997, with total BRI lines estimated at 780,000 and 1,483,-000, respectively.*

**Japan—Land of the early adopters**

*In Japan, the telephone company has equipped most of its central offices with ISDN. ISDN services for various applications continue to be deployed very aggressively and Network Express is one of the selected vendors that is facilitating the access of customers to ISDN applications. There will be increased competition in Japan, but it is our expectation that Network Express, which has approximately 25% of this market, will continue to hold its share of this market which is growing at 75% annually.*

**Europe—ISDN opportunities waiting to be seized.**

*Network Express does not have any meaningful market presence in Europe, currently. However, with part of the proceeds of the secondary offering Network Express plans to establish a sales, service and support network in Europe over the next several years. We expect initial sales to come from the United Kingdom, Sweden and, possibly, Norway. The Company plans to open offices in Germany and is recruiting for a manager there. The Company is certified in the UK, and is in the process of getting certification in other European countries. The market in Europe should grow at about the same rate as the international ISDN market in general. We expect Network Express to have meaningful revenue from Europe in 1996.*

**498**

(Unterberg Harris June 1, 1995 Report at pp. 9–10).

Thereafter, the Report describes how NEI will capitalize on growth in the ISDN market. Specifically, the Report states that NEI will:

> Enhance and expand the product line to best serve the changing needs of corporate users. Network Express has a scalable platform which enables and extends interoperability, and is geared toward any organization requiring occasional high-speed access to one or more remote sites....
>
> Maintain and leverage its strong position in Japan by capitalizing on continued growth in the market by working with Soliton and large companies in Japan to design and deliver increased functionality. In Japan, Network Express has a strong position with major corporations like Mitsubishi Bank, NTT, the Japanese equivalent of Federal Express and others. The applications in Japan continue to grow—from corporate applications to Karoke bars.
>
> Increase U.S. and European presence by using quality-engineered technology and products to penetrate the domestic and European markets.... A new sales and marketing effort by the Company has targeted key businesses and distributors, and significant resources have been expended to date; and additional funds are earmarked for the future to increase Network Express' presence in fast-growing markets....

*Id.* at p. 12.

Next, the Report discusses NEI's product line:

> The two main product lines that Network Express offers are the NE ISDN Router and NE ISDN Hub. They are offered in several platforms and the software is integrated with the NE Series Hardware ...
>
> The NE ISDN Router is used for bridging and routing between LANs connected across dispersed geographical distances ...
>
> NE ISDN InterHub is designed to work with bridges routers and adapters pro-

duced by other manufacturers, as well as the NE ISDN Router ...

> The Company introduced the NELink–1000 in March, 1995. It interoperates with a wide range of ISDN remote access products and Switched 56 Lan access devices, including terminal adapters, workstations, bridges and routers. The benefits of the NELink–1000 include performance (compression capability, inverse multiplexing and management of WAN connections and heavy background LAN traffic), reliability (use of protocols to ensure integrity of software), manageability, security, and economy.

*Id.* at pp. 11–12.

With respect to the Competitive Landscape, the Report states that:

> **Network Express does not compete in the low-end of the market** (devices that support up to 2 channels). There are a number of players that build products for workstations and desk-tops and Network Express views this as a commodity market. Network Express will interoperate with most of them, such as Combinet, Gandalf, IBM, Silicon Graphics Inc., Sun Microsystems, and 3Com. These companies build ISDN adapters that generally support 2 channels. Network Express most recent product, the NELink–1000, can be placed at a client site that needs more than 2 connections but less than 8 connections.
>
> **Network Express' products are positioned for the remote access market,** which is defined as remote offices and remote users accessing a central site for corporate resources and servers. In this market, it will face competition from Ascend. Cisco competes at the high end of this market and supports mainly PRI lines.... 3Com with its recent acquisition of Sonix will compete in the low-end of the market where Network Express does not compete. We believe that some of the product differentiators mentioned above give Network Express a 9 to 12 month advantage over most of it's competition. In Japan, it has the lead over its competi-

tion and we believe that that lead is at least 12 months....

*Id.* at p. 13.

The Report also identifies the investment risks associated with NEI:

**Distribution Channels**

Network Express has been focusing on the Japanese market. Until now the Company has had no real distribution channel in the United States. It was dependent on selling products through telephone companies and others in the United States. A key challenge is for Network Express to build its distribution channels in the United States quickly in order to penetrate the corporate and Internet market place in the United States.

\*     \*     \*     \*     \*     \*

*Short term dependence on a single customer*

*Under the agreement that Network Express has signed with Soliton, that company is the sole distributor for Network Express products in Japan. However, Soliton can sell products of other companies, including those of Network Express' competitors. Since Soliton currently accounts for over 80% of the company's sales, any de-emphasis of Network Express' products by Soliton or modification of the Soliton agreement with Network Express to less favorable terms could impact the company's earnings.*

*It is our understanding, based on discussions with Soliton, that this is not likely to happen. Soliton is in a favorable position with the Japanese phone company, NTT, largely because of Network Express. Network Express has done various product enhancements and continues to do them for Soliton to respond to the needs of Soliton's customers and NTT. This relationship keeps Network Express at the forefront of technical developments. It is our belief that Soliton is very interested in continuing this relationship—they need Network Express just as much as Network Express needs them.*

*Id.* at p. 16.

Finally, the Report discusses NEI's finances:

**PROMISING FINANCIAL OUTLOOK**

*We are estimating revenues for full year 1995 at $22.7 million—a growth of 104%—and EPS of $.024. We estimate $19.2 million of this revenue to come from Japan and $3.1 million to come from the United States. The share of earnings attributable to the U.S. should continue to increase in 1996 as the distributor channel is created and the sales force begins to penetrate the U.S. market.* Margins are very dependent on the product mix and vary from product to product. As higher margin products such as NE4000 and NE5000 make a greater contribution to revenue, we expect gross margins to increase to 48.6% in 1995 from 42.3% in 1994. We expect the Company to continue to spend aggressively on building the sales organization, as a result we expect SG & A to rise in fiscal 195 to 21.8% before beginning to decline in 1996 as sales grow. *For 1996, we are currently carrying a revenue estimate of $38.9 million and an EPS of 38 cents.*

\*     \*     \*     \*     \*     \*

*Table 1—Estimated Revenue mix by country*

|  | Japan | United States | Europe | Total |
|---|---|---|---|---|
| *1994* | $ 9.8 | $ 1.3 | 0 | $11.1 |
| *1995E* | $19.2 | $ 3.1 | $ .3 | $22.7 |
| *1996E* | $24.5 | $11.7 | $2.7 | $38.9 |

*Id.* at p. 17.

**G.  The Furman Selz June 19, 1995 Research Report.**

On June 19, 1995, Furman Selz issued a Research Report on NEI which NEI reviewed and approved prior to its release and which NEI subsequently copied and distributed to the public. (Complaint, ¶ 44). In this Report, Furman Selz makes the following revenue forecast regarding NEI:

|  | Quarterly EPS | |
|---|---|---|
|  | *1995E* | *1996E* |
| *March* | *$0.05A* | *$0.08E* |
| *June* | *$0.05E* | *$0.09E* |
| *September* | *$0.07E* | *$0.09E* |
| *December* | *$0.08E* | *$0.11E* |
| *Year* | *$0.24E* | *$0.37E* |

(Furman Selz June 19, 1995 Report, Furman Selz and Unterberg Harris' Ex. D, p. 1).

The Report also provides a Summary and Investment Opinion:

> Network Express is a pure play on the growth of ISDN ... one of the fastest growing services in the communications sector....
>
> *Almost from its inception, Network Express has concentrated its efforts on the Japanese market, and as a result, it derives about 90% of its revenue from sales in that country. While we expect Japanese revenues to continue to increase at a fairly robust rate over the next several years, we also expect the company to undergo a significant geographic diversification of its revenue base. Over the next five years, we believe Network Express will expand its sales in the United States to the point where it equals or exceeds that of Japan. Furthermore, Europe and the Pacific Rim could easily account for 20% of total revenues in five years.*
>
> *From a profitability perspective, a redistribution of the revenue geographically should cause gross margins to expand substantially given that the Japanese market should decrease as a percent of total revenue.* In order to gain entry to the Japanese market, Network Express had to enter into an exclusive distribution agreement with a highly regarded distributor (Soliton) at terms that were quite favorable to Soliton. Even though Network Express was able to renegotiate the terms of its agreement, permitting it to achieve higher gross margins, the new terms still result in gross margins from the Japanese business that are at least 1,000–basis points below that of the company's other businesses. *Over time, as the company achieves a redistribution of its revenues, we expect overall gross margins to increase from 48% currently to 52% to 55% within two years; over the long term, margins should approach 60%.*
>
> *Given our optimism about both revenue growth and margin expansion for Network Express over the next several years, we expect pre-tax profits to grow at a triple-digit rate over the next two years ... Our EPS estimates for 1995 and 1996 are $.024 and $0.37 respectively, up from*

> *$0.07 in 1994. Looking out to 1997, we believe the company can earn $0.65–$0.75 per share if it is successful in its marketing efforts both in the United States and Europe.*

*Id.* at pp. 1–2.

Furman Selz also noted the dependency of NEI's Japanese revenues on the NTT–Soliton Contract, and the limited success of its United States endeavors:

> Through its distributor, Soliton, [NEI] has become one of the leading suppliers of internetworking equipment to Nippon Telephone and Telegraph (NTT), which is the largest telephone company in the world. We believe NTT alone was responsible for half of [NEI]'s revenues from Japan last year, split evenly between products that NTT has installed for its own networking requirement and those products it sells to other entities in that country who are using NTT as a systems integrator.
>
> In the U.S. market, Internet access, video conferencing and data internetworking are all driving demand for ISDN lines. For the most part, [NEI] has concentrated its efforts on the corporate internetworking uses for ISDN and has achieved some small measure of success. More recently, it has begun to pursue a number of Internet gateway provides, and in our opinion, should be successful in garnering some of that business.

*Id.* at pp. 9–10.

Next, the Report describes NEI's products:

> *[NEI] has four distinct products ranging from the NE1000, which supports up to 8 connections, all the way to the NE5000, which offers up to 48 connections. Each of these devices is fully interoperable and scaleable so that the user can link them with other vendors' devices. Also, the higher end products can be stacked in order to create additional capacity.*
>
> *Listed below is a brief description of each of the company's four platforms and their primary use in the internetworking arena.*
>
> > *The NELINK–1000 supports up to 8 connections and is designed for the small central site or remote office get-*

ting started with ISDN internetworking. The NELINK–1000 fills two ISDN internetworking needs. As a starter kit at a small central site, it provides interoperability with the widest array of remote access products. In addition, it can be used for multiple users needing remote access to one or more scaleable NE 2000 IIs, 4000s, or 5000s at central sites.

*Id.* at p. 10.

Furman Selz also provided, by geographic region, a revenue outlook:

*Japan*—As we stated earlier, Japan has been the primary source of revenue for [NEI] since its inception as a company (March 1990). Over the last three years (1992–94), the Japanese market has accounted for 79%, 79%, and 88% of total revenue, respectively. In the first quarter of 1995, the percentage increased to 93% of revenue. Table 5 contains [NEI]'s Japanese revenues since 1992, along with our forecast for the next three years:

Network Express, Inc.
Revenue in Japan
($ in millions)

|       | Japan Revenue | Share of Total Revenue (%) | Total [NEI] Revenue |
|-------|---------------|----------------------------|---------------------|
| 1992  | $ 1.1         | 79%                        | $ 1.4               |
| 1993  | $ 3.2         | 79%                        | $ 4.0               |
| 1994  | $ 9.8         | 88%                        | $11.1               |
| 1995E | $20.1         | 85%                        | $23.5               |
| 1996E | $24.7         | 62%                        | $40.1               |
| 1997E | $31.0         | 54%                        | $57.0               |

As the table suggests, we believe this market will continue to grow at a fairly rapid rate for Network Express (even though it should decrease as a percent of total revenue).

One [of several reasons] we feel this market will continue to expand rapidly is that … NTT is continuously expanding its internal uses for ISDN, such as linking together all of its repair and installation centers.

Considering how high a priority NTT has placed on this service and the fact that it is available anywhere in Japan, it seems quite clear that ISDN has been targeted as the replacement for plain old analog telephony in Japan. If this assumption on our part is even remotely correct, then the ISDN equipment market for [NEI] must still be viewed as immature. In our opinion, *the revenue that the company derives*

just from the Japanese market could increase to almost $50 million per year from the projected $20 million this year by the end of the decade.

A major reason for Network Express's high market share in Japan is its distributor Soliton, who in that market is the most highly regarded organization in the area of ISDN internetworking. Without question, it was because of Soliton that Network Express has been able to penetrate this market. *Given the close working relationship that exists between these two organizations, we believe that the opportunities to expand revenue in that country are virtually limitless.*

It is our understanding that Soliton is viewed by NTT as the expert in the area of ISDN solutions; that position should work to [NEI]'s advantage over the next few years …

As an illustration of how well [NEI] and Soliton work together, [NEI] responded to Soliton's need for a low-end product by introducing the NE 1000. Subsequent to the introduction of that product, Soliton was able to secure a sizable order against which the company is currently shipping. By quickly introducing the kinds of products that its distributors can sell, [NEI] is solidifying its position, which in turn will only lead to more business in the future.

*United States*—While the company's U.S. revenue have grown from $291,000 in 1992 to $1,301,000 in 1994, it has actually decreased as a percent of the total because of the growth of the business in Japan. However, we expect the Japanese market to decrease as a percent of total revenue over the next few years, while the U.S. market should increase as a percent of total revenue. As shown in Table 6, we are projecting U.S. revenues of $3.1 million in 1995, $13.6 million in 1996, and $21.0 million in 1997.

Network Express, Inc.
Revenue in United States
($ in millions)

|       | U.S. Revenue | Share of Total Revenue (%) | Total [NEI] Revenue |
|-------|--------------|----------------------------|---------------------|
| 1992  | $ 0.3        | 21%                        | $ 1.4               |
| 1993  | $ 0.8        | 20%                        | $ 4.0               |
| 1994  | $ 1.3        | 12%                        | $11.1               |
| 1995E | $ 3.1        | 13%                        | $23.5               |
| 1996E | $13.6        | 34%                        | $40.1               |
| 1997E | $21.0        | 37%                        | $57.0               |

*We attribute the lack of revenue generated in the United States to the following: 1) the U.S. [telephone companies] did not deploy ISDN on a widespread basis and also priced it too high until very recently; and 2)[NEI] did not have the right people in place to sell its products here. Now that both of these issues have been effectively dealt with, there should be a dramatic upturn in the company's domestic business over the next few years.*

*... [T]he company's marketing strategy is far more encompassing than just signing up a major internetworking distributor. We believe [NEI] has also begun to do the visionary work needed to support those VARs. In that regard, the company has scheduled 18 seminars across the country between June 14 and June 28 to stimulate demand for its products ...*

*We see U.S. demand being driven by the major corporations setting up data networks using ISDN lines ... One example of this is a network that [NEI] helped construct for Silicon Graphics. It is our understanding that [NEI] is currently responding to numerous requests for proposals by Fortune 100 companies to help build wide-area networks ...*

*Europe/Pacific Rim—Within these geographic areas, the company generated only negligible revenue up until now. Given the limited financial resources available to [NEI] prior to the recent secondary equity offering, it was impractical for it to attempt to penetrate any market other than Japan and the United States. In Europe, any company that wants to sell equipment that attaches to any of the public switched networks must go through a certification process called homologation before that company is permitted to offer its products for sale. This homologation process is a country-by-country certification that can be quite costly for a small company like [NEI]. ...*

\*   \*   \*   \*   \*   \*

*With Europe in a formative stage of development and the other markets around the world several years away from becoming established markets for [NEI], our revenue forecast for these markets are quite modest in comparison to the U.S. and Japan ...*

*Network Express, Inc.*
*Revenue Excluding Japan and the United States*
*($ in millions)*

| | U.S. Revenue | Share of Total Revenue (%) | Total [NEI] Revenue |
|---|---|---|---|
| *1992* | *$0.0* | *0%* | *$1.4* |
| *1993* | *$0.0* | *0%* | *$4.0* |
| *1994* | *$0.0* | *0%* | *$11.1* |
| *1995E* | *$0.4* | *1%* | *$23.5* |
| *1996E* | *$1.8* | *4%* | *$40.1* |
| *1997E* | *$5.0* | *9%* | *$57.0* |

Furman Selz June 19, 1995 Report, Furman Selz and Unterberg Harris' Ex. D, pp. 10–14.

In conclusion, the Report states that:

*Based upon our conviction concerning [NEI]'s ability to effect a strong entry into the U.S. domestic market, its continuing strong position in Japan, and the potential of some operations that are beginning to develop in Europe, we are quite confident that [NEI] can grow at a rapid rate over the next several years. In our opinion, this equity, at current levels, is quite attractive given our confidence that it will generate rapid EPS growth over the next few years.*

*Id.* at pp. 10–14.

**H.   *July 12, 1995 Press Release.***

On July 12, 1995, NEI released its second quarter 1995 results, reporting revenues, net income and earnings per share of $6.2 million, $631,000 and $.07, respectively, which exceeded the previous forecasts. (Complaint, ¶ 45). The corporate press release declares:

*Sales Up in All Markets*

*Sales of the Company's products increased in all markets. Revenue from Japan, resulting from sales to Soliton Systems, K.K., the exclusive distributor of the Company's products in Japan, increased to $5.3 million (85 percent of total revenue) in the latest quarter from $4.2 million (93 percent of total revenue) in the first quarter of 1995. The increase was due primarily to sales of the Company's products to support a large internal networking project at NTT, the Japanese telecommunications carrier. The project accounted for approximately 57 percent of the Company's sales to Soliton in the second quarter.*

*The Company currently expects that this project will be completed in the fourth quarter of 1995.*

*The growth of business in Japan has caused the Company to be somewhat over capacity. "Some shipments to Soliton were late because of supplier problems related to the ramp up of production capacity. We have also sent additional staff to work with Soliton and its customers in this period of very rapid growth," Eidswick noted.*

*NELink 1000 Shipped to Japan*

*A portion of the increase in Japanese sales was attributable to the NELink 1000 product introduced during the quarter. Soliton ordered more than 600 units in the quarter, of which approximately 500 were shipped and are now being installed in another large project. "The new products are part of a large network installation scheduled for completion this summer. The project is expected to be completed in the third quarter," Eidswick explained. "Soliton has purchased additional NELink products for sales to other companies," he added.*

*The NELink 1000 is a fully integrated, economical internetworking device designed for central sites or remote offices getting started with ISDN internetworking. It was developed as a new architecture for ISDN internetworking and is now available in two models for the small branch-office market. The new products are also available in the U.S. and European markets.*

(Complaint, ¶ 45).

## I. Conference Call After Announcement of Second Quarter Results.

Following the release of NEI's 1995 second quarter results, Eidswick and Hartmann conducted a conference call with Furman Selz, Unterberg Harris, institutional investors, and NEI shareholders during which Eidswick and Hartmann stated the following:

☐ *Demand for the Company's products in Japan remained strong.*

☐ *The Company's plans to expand its sales in the United States and Europe was on track and succeeding.*

☐ *[NEI]'s new NELink 1000 product was a great success, achieving strong sales levels.*

☐ *[NEI] expected strong revenue growth in the United States in 1996.*

☐ *[NEI] was forecasting third and fourth quarter 1995 earnings per share of $.07 and $.08, respectively, and 1995 earnings per share of $.26.*

(Complaint, ¶ 46).

## J. Furman Selz July 13, 1995 Report.

The day after the second quarter announcement, Furman Selz issued a second report on NEI. Here, Furman Selz made the following earnings forecast:

|  | Quarterly EPS | |
| --- | --- | --- |
|  | *1995E* | *1996E* |
| *March* | *$0.05A* | *$0.08E* |
| *June* | *$0.07A* | *$0.09E* |
| *September* | *$0.07E* | *$0.10E* |
| *December* | *$0.08E* | *$0.11E* |
| *Year* | *$0.26E* | *$0.38E* |

(Furman Selz Report dated July 14, 1995, Furman Selz and Unterberg Harris' Ex. E, p. 4). With respect to the second quarter, the Report stated:

*Second Quarter Beats Expectations*

*In the recently-concluded second quarter, Network Express generated revenue of $6.2 million, which surpassed our forecast of $5.6 million and represents a 158% increase over last year's second quarter of $2.4 million. The major reasons for this robust sales growth are continued strong demand for its products in the Japanese market coupled with a record-level of U.S. business. Moreover, the company continues to experience excellent demand for its product from Nippon Telephone & Telegraph (NTT); and in this country, both the U.S. government and Motorola were cited as important contributors to [NEI]'s domestic sales in the second quarter.*

*As a result of the surge in revenues, second-quarter earnings per share also exceeded our expectations; the company reported $0.07 (up from $0.02 in 1994), which is 40% higher than our forecast of $0.05.*

*Looking forward, we expect domestic revenue to increase as a percent of total revenue, even though our model assumes continued strong sales to Japan. During the month of June, [NEI] held a series of seminars across the United States that generated a significant number of good leads. Furthermore, over the next several quarters, the company's recently consummated agreement with Intelligent Electronics is expected to bear fruit. Initially, the company will generate some revenue simply by selling demo equipment to the VARs within this group. Based upon the company now being in a good position to capture its share of the ISDN internetworking market, which is expected to grow significantly in this country, we believe [NEI]'s domestic business will increase by over 300% in 1996.*

\*     \*     \*     \*     \*     \*

Although we are not raising our second-half or full-year earnings and revenue forecast materially at this time, the second-quarter results clearly suggest that [NEI] could exceed our projections ... [W]e [ ] believe that the geographic mix will change somewhat from our earlier projections. *Clearly the business in the United States seems to be coming on faster than we had envisioned; therefore, we are raising our estimate of domestic revenue for 1995 as a whole from $3.0 million to $4.1 million and nudging the forecast for Europe upward from $350,000 to $400,000. On the other hand, because the company has not yet received any firm commitments for additional business from NTT, we are revising our estimate for Japan downward slightly from $20.1 million to $19.2 million. This situation could change at any time and, if it does, it would result in greater-than-expected revenue from this market. For now, we are taking a conservative position.*

*Id.* at pp. 1–2.

On July 12–13, 1995, NEI's stock reached a price of $18 1/4 per share. (Complaint, ¶ 48). On July 6, 1995, the stock had been valued at 13 1/2 per share. (*Id.*).

### K. *July 26, 1995 Announcement Regarding Pacific Bell.*

On July 26, 1995, NEI released the following announcement regarding a trial project with Pacific Bell:

*Pacific Bell Testing Telecommuting Applications Using the ISDN InterHub from Network Express*

*Pacific Bell is teaming with Network Express, a manufacturer of hardware and software for creating secure high-speed LAN access using ISDN, on a technology test that will carry a range of telecommuting applications.*

*Pacific Bell is widely considered the industry leader in promoting and adopting the practice of telecommuting. It has helped scores of companies create successful telecommuting programs by providing support on everything from network services to how to manage mobile work teams. The Company also actively encourages its own managers to telecommute as frequently as possible.*

*"We're always looking for better ways to telecommute," said Brent Reid, applications engineer at Pacific Bell's ISDN lab. "When we know something works, we can pass that knowledge on to our customers."*

*ISDN InterHubs from Network Express will be key components in a network that will give Pacific Bell managers from all over the state secure remote access to internal company computer networks.*

*"The biggest issues with telecommuting are speed and security," Reid explained. "ISDN, which transmits information rapidly and inexpensively, solves the speed problem, and we are using eight Network Express InterHubs for the security." The NE InterHub enables users to transfer data securely and it is fully interoperable with a wide range of vendor's LAN access equipment. The NE InterHub provides security for both the telecommuters and Pacific Bell's network.*

(Complaint, ¶ 49).

### L. *July 27, 1995 Furman Selz Report.*

On July 27, 1995, Furman Selz issued another report regarding NEI which reiterated

its July 13, 1995 earnings forecast and described the Pacific Bell project:

> Yesterday, Network Express announced the start-up of a telecommuting trial project with Pacific Bell. Although Pacific Bell is not a new customer for [NEI], this announcement does represent an expansion of the relationship. In addition, while the trial initially consists of only 50 to 60 of Pacific Bell employees, we see this as a significant endorsement of [NEI's] product line. As stated by Robert Reid of Pacific Bell['s] ISDN lab, "We are always looking for better ways to telecommute. When we know something works, we can pass that knowledge on to our customers." While this project is not expected to generate any significant revenue for [NEI] this year, if Pacific Bell chooses to roll out the product throughout their entire company, there could be a material impact for [NEI] in 1996.
>
> More importantly, we see this announcement as the most recent indication of the inroads the company is making into the domestic market. As we have said in the past, we expect [NEI] to announce several significant new customer relationships over the next few months as the company[']s recent marketing efforts and its recently consummated distribution agreement with Intelligent Electronics begin to bear fruit.

Furman Selz July 27, 1995 Report, Furman Selz and Unterberg Harris' Ex. F, p. 1.

## M. *Eidswick, Sullivan, and Swanson Sell Additional Stock.*

During this time and shortly thereafter, NEI's stock price climbed from $15 3/4 to $18 1/8 per share on July 26, 1995, and by August 9, 1995, it reached an all-time high of 19 5/8. (Complaint, ¶ 51). Between August 9–10, 1995, Eidswick, Sullivan, and Swanson sold an additional 59,000 shares of NEI stock at $18–$19.50 per share. *Id.* Although additional sales by corporate officers were barred under the 120–day "lock-up" agreement of the Secondary Offering, Unterberg Harris and Furman Selz permitted these additional sales without any public disclosure. (Complaint, ¶ 51). Thereafter, NEI's stock began

to decline, and, by late August, it had fallen to as low as 14 3/4.

## N. *Furman Selz's August 29, 1995 Report.*

On August 29, 1995, Furman Selz, with the approval of NEI, issued a report which reiterated its previous earnings forecast from July 13, 1995, and commented upon the drop in NEI's stock price:

*RECENT WEAKNESS CREATES BUYING OPPORTUNITY*

\*     \*     \*     \*     \*     \*

**Summary**

*In our opinion, a number of isolated events have combined to cause Network Express's stock to give back about half the gain of the last two months.* The following are factors which we believe contributed to this recent period of weakness:

☐ Several major router companies have begun to acquire small internetworking businesses that [NEI] competes against. The prices paid suggest that the total market value of [NEI] as a company is quite high. Additionally, as these major router companies ... focus on the Japanese market, [NEI] is likely to lose out.

☐ With the yen beginning to decline against the dollar, there is a concern about [NEI]'s margins coming under pressure.

☐ Richard Eidswick, the company's co-founder and CEO, sold shares recently, which implies he believes the stock is overpriced and/or that analyst expectations are too optimistic.

**Our View**

In terms of the prospect for additional competition in Japan, we believe [NEI]'s position to be extremely solid. Earlier this year, the company won a major piece of business for its newest product, the NE 1000. Until this product became available, [NEI] could not have even bid for this order, let alone win it. Given the company's continuous upgrading and the comprehensiveness of its current product line, we doubt it will be displaced by anyone in the Japanese market over the next year or two. Furthermore, it is likely that [NEI] could win some additional new orders from

either NTT or other major industrial customers in that country.

With respect to the impact of the dollar on its business in Japan, it would take a significantly higher dollar versus the yen before any gross margin pressures would occur. In our opinion, the yen would have to exceed 110 before it would cause us to reduce our gross margin forecasts for this year. In addition, while Mr. Eidswick sold some of his shares, he also exercised options to purchase additional stock in the company. All told, he has increased his total position in [NEI] equity by over 40,000 shares over the last three months.

**Outlook Remains Positive**

*As far as the company's fundamental outlook is concerned, we continue to be very optimistic. Although the rate of change in growth is expected to slow substantially, Japan is likely to be an ongoing growth market. Offsetting the slowing growth in Japan will be the development of the U.S. and European markets for this company over the next few years. In the United States, we expect the company to continue to make strides, particularly among the Fortune 100 companies, and we also expect [NEI] to gain some additional service bureau contacts over the next 18 months. Furthermore, we believe the company should be able to secure additional revenue from U.S. government orders, an area that has already produced some measure of success.*

*Europe continues to be a positive surprise relative to our expectations, with business from the United Kingdom and Scandinavia likely to accelerate over the course of both this year and next. As the company gears up its marketing efforts, there will be additional opportunities within the common market. Overall, we are encouraged by the developments so far in Europe and are confident that this will become an important market for [NEI] over the next few years.*

*With aggregate revenue growth expected to remain high and gross margins forecasted to expand over the next several years, we believe this stock is quite attractive at current prices. Additionally, compared*

with the other companies who provide ISDN internetworking equipment, [NEI] is by far the best value in the sector.

Furman Selz Report dated September 1, 1995, Furman Selz and Unterberg Harris' Ex. G, pp. 1–2. Subsequent to this Report, NEI's stock rose to $18–$19 per share in mid–September 1995.

(Complaint, ¶ 53).

### O. NEI's September 27, 1995 Press Releases.

On September 27, 1995, NEI issued two corporate press releases. (Complaint, ¶ 54). In one, NEI announced a new executive hiring:

*Network Express Appoints Former Banyan Executive to Vice President of European Operations*

*Network Express, Inc. today announced that Gerhard Beeker will join the company as Vice President of European Operations starting October 1, 1995.*

\*    \*    \*    \*    \*    \*

*"Gerhard Beeker joins Network Express during a time when our presence in the European community is increasing rapidly," said Richard P. Eidswick, president and chief executive officer of Network Express.*

\*    \*    \*    \*    \*    \*

*"Network Express has made great headway in introducing its products to the European community," said Beeker.*

(Complaint, ¶ 54).

The other press release read as follows:

*Network Express, Inc. today announced that several of its LAN–to–LAN ISDN internetworking products have been approved and certified for sale in 10 European countries by the European Union (EU).*

\*    \*    \*    \*    \*    \*

**About The Products**

\*    \*    \*    \*    \*    \*

*The NE Link 1000 is an internetworking product designed for the small central site or remote office using ISDN for the exchange of data, graphic, and image files.*

*It interoperates with a wide range of ISDN remote access products and provides robust security options and unique bandwidth-on-demand features.*

(Complaint, ¶ 55).

## Q. *October 1995.*

Plaintiffs allege that "[i]n early October 1995," NEI's stock price began to fall, as "word leaked into the market that [NEI]'s third quarter results could be worse than expected." (Complaint, ¶ 57). Specifically, "[a]s this information leaked into the market," "[NEI]'s stock began to decline, falling from a high of $16 on October 2, 1995, to as low as $10 5/8 per share on October 5, 1995, before closing at $12 per share on October 5, 1995." (Complaint, ¶ 57).

On October 6, 1995, NEI announced it third quarter results:

Network Express, Inc. today announced increases in revenue, net income and net income per share for the quarter and nine months ended September 30, 1995.

The Company said revenue for the quarter rose to $6.2 million from $2.9 million in the same quarter of 1994. Net income was $755,000, or $.07 per share, versus $105,-000, or $.02 per share in last year's third quarter . . .

\* \* \* \* \* \*

"The results are a significant improvement over last year, but we continue to be faced with many challenges in the future as we open new markets and meet increasing competition," said Richard Eidswick, president and chief executive of the internetworking company.

\* \* \* \* \* \*

Sales in Japan

Sales of the Company's products increased in Japan. Sales to Soliton Systems, K.K., the exclusive distributor of the Company's products in Japan, increased to $5.5 million (88.6% of total revenue) in the latest quarter, from $2.5 million (86.5% of total revenue) in the third quarter of 1994. The increase was due primarily to sales of the

Company's products to support a large internal networking project at NTT, the Japanese telecommunications carrier. The project accounted for approximately 55% of the Company's sales to Soliton in the third quarter. As previously reported, the Company believes this project is nearly complete and will be completed in the fourth quarter of 1995. Although it is difficult to project future sales in Japan, based upon current estimates from Soliton, the Company expects that sales to Japan will decrease in the fourth quarter from third quarter levels, as orders relating to the NTT project have been substantially filled, and no projects of a comparable magnitude are expected to begin in the quarter.

NELink–1000 (TM) Sales

The NELink–1000 is a fully integrated, economical internetworking device designed for central sites or remote offices getting started with ISDN internetworking. It was developed as a new architecture for ISDN internetworking and is now available in two models for the small branch-office market. The new products are also available in the U.S. and European markets. NELink–1000 sales in Japan increased to $1.1 million in the third quarter, from $675,000 in the second quarter, because of new and follow-on orders for this new product.

In a recent article in a national computer networking industry magazine, the Company's NELink–1000 product was reviewed with direct remote access products designed for end-user applications that are inconsistent with the NELink–1000 features. As a result, the products that the NELink–1000 was compared to scored higher. This product has been sold successfully in Japan and the U.S. for central site and large remote office ISDN internetworking. However, it will not be released for remote applications until it has additional features required for such applications.[3]

Sales in the U.S.

**3.** At the hearing on this matter, the parties could not identify this specific article or its date. Nevertheless, the parties agreed that this article— and others similar to it—appeared before October 6, 1995.

Sales in the U.S. increased to $643,000 (10.3% of total revenue) in the third quarter from $395,000 (13.5% of total revenue) in the third quarter of last year and down from $856,000 in the second quarter of 1995. Eidswick said, "I am pleased with the direction and progress of our U.S. sales and marketing effort, but it is too early to see a steady progression of quarterly revenue increases."

＊　　＊　　＊　　＊　　＊　　＊

Expenses, Gross Margin and Profit

Expenses increased in all major categories as the Company responded to the demands of growth ... "We expect expenses to continue to increase in the fourth quarter as the Company responds to market opportunities and product-development requirements," Eidswick explained.

Gross margins for the [third] quarter was 48%, up from 46% in the second quarter. The increase in gross margins was due primarily to the mix of product sold.

(October 6, 1995 Press Release, NEI Ex. C, pp. 1–3.)

During the three trading days following the October 6, 1995 press release, NEI's stock price dropped from $12 per share to $6 1/2 per share. (Complaint, ¶ 58). Thereafter, NEI revealed that it expected a significant operating loss for the fourth quarter of 1995 with declining revenues and that it expected its sales in Japan in 1996 to be half of its 1995 levels. (*Id.*). Then, NEI's stock fell to $ 4 1/8 per share. (*Id.*).

**R.** *November 1995 and Other Subsequent Events.*

In November 1995, NEI acquired Fivemere, Ltd. for approximately $10 million. (*Id.*). subsequently, NEI reported its 1995 results: net income of $178,000, earnings per share of $.02, and a net operating loss in the fourth quarter of $1.5 million on revenues of $1.9 million. (*Id.*). Each of these results was below the previous forecasts that Defendants made during the Class Period.

In the first quarter of 1996, NEI reported further declines in revenues and a net loss of $2.2 million, or $.20 per share. In the second quarter of 1996, NEI had an operating loss of $5.6 million and was then acquired by Cabletron. On October 7, 1996, Plaintiffs filed the instant Complaint.

### III. *PLAINTIFFS' CLAIMS*

Relying on this factual background, Plaintiffs claim that the statements *italicized* in the various documents, press releases, and reports set forth above regarding NEI's business, products, and prospects were false and misleading when made and failed to disclose material adverse information, which Plaintiffs allege was known only to NEI's insiders due to their access to internal corporate data.

Specifically, Plaintiffs first allege that NEI concealed that it really had only one source of business in Japan of any significance, which was the NTT contract with its Japanese distributor, Soliton, and that NEI's insiders knew that once the NTT contract was completed, the company's prospects for continued revenue from Japan were virtually nill. Plaintiffs further claim that NEI knew that its revenues from Japan would sharply drop off in the fourth quarter of 1995 and substantially decline by the end of 1996.

With respect to the NTT contract, Plaintiffs also contend that NEI failed to disclose that it had pre-shipped or advance-shipped a number of products for use in the contract in order to artificially boost its first and second quarter 1995 reported net income, even though the products shipped were not needed until the succeeding quarter. This, Plaintiffs claim, resulted in an even sharper drop off in sales in Japan in the fourth quarter of 1995.

Plaintiffs also claim that NEI concealed the fact that the company's projected revenue and income growth in 1996 depended on the success of the NELink 1000 InterHub product in Japan, but that due to inadequate engineering or quality control programs (which Plaintiffs claim Defendants also failed to disclose), the product had many design deficiencies and manufacturing problems. As a consequence, the NELink 1000 product failed to achieve remote access capability which was necessary for the product to achieve commercial success. They further

argue that NEI failed to disclose that its products were achieving very little success in the United States and Europe.

Plaintiffs allege that as a result of the hidden problems with the NELink 1000 and the failure of NEI products to achieve commercial success in the United States and Europe, the company's sales were well below the levels predicted and necessary for the revenue and earnings growth forecast. With respect to United States business, Plaintiffs also point to the results of NEI's test work with Pacific Bell. Plaintiffs claim that Defendants failed to disclose that this Pacific Bell work demonstrated that there was virtually no probability of significant commercial revenue to be obtained from those activities or from the company's relationships with the Regional Bell Operating Companies in the foreseeable future.

As a result of all of the foregoing, Plaintiffs claim that the forecasts and projections made by and for NEI by the Defendants of strong revenue growth in the United States and Europe in 1995 and 1996, for continued strong revenues from Japan in 1996, and for projected earnings per share of $.24–$.26 in 1995 and $.37–$.38 in 1996 had no reasonable basis in fact.

## IV. ANALYSIS

### A. The Applicable Standard on a Fed. R.Civ.P. 12(b)(6) Motion to Dismiss.

Defendants have moved to dismiss this case pursuant to Fed.R.Civ.P. 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief can be granted. In considering a Motion under Fed.R.Civ.P. 12(b)(6), the Court is required to accept the well-pleaded factual allegations set forth in the plaintiff's complaint as true. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). However, the Court need not accept as true any legal conclusions or unwarranted factual inferences. *Morgan, supra; Westlake, supra. See also, Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir.1971) (the court is "required to ac-

cept only well-pleaded facts as true, not the legal conclusions that may be alleged or that may be drawn from the pleaded facts"). Moreover, the Court may properly consider, for the purposes of a Motion under Fed. R.Civ.P. 12(b)(6), the entirety of documents which Plaintiffs rely upon and quote in their Complaint without transforming the Motion into one for Summary Judgment. *Teagardener v. Republic–Franklin Inc. Pension Plan,* 909 F.2d 947, 949–50 (6th Cir.1990), *cert. denied,* 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991).

### B. Plaintiffs' Complaint is Barred by the Statute of Limitations.

In their Motions to Dismiss, Defendants contend that the Court should dismiss Plaintiffs' claims because they are time-barred. Here, Defendants make two arguments: (1) Plaintiffs had actual notice of the alleged securities fraud on or about October 5 or 6, 1995, relying on the October 5, 1995 drop in NEI's stock price and NEI's October 6, 1995 press release regarding its recent set backs; and (2) Plaintiffs had inquiry notice of the alleged securities fraud prior to October 5 or 6, 1995. Plaintiffs respond that they were not on inquiry notice and that, with respect to actual notice, their Complaint is timely, assuming actual notice on October 5 or 6, 1995, because October 5 and 6, 1996 were a weekend, thereby bringing their October 7, 1996 Complaint within the one-year statute of limitations pursuant to Fed.R.Civ.P. 6(a).

#### 1. Actual Notice.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359–62, 111 S.Ct. 2773, 2780–82, 115 L.Ed.2d 321 (1991), the Supreme Court held that claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), must be asserted within one year after discovery of the facts constituting the alleged violation and within three years after the alleged violation occurred. Fed.R.Civ.P. 6(a) provides that:

> In computing any period of time prescribed or allowed by ... any applicable statute, *the day of the act, event, or default from which the designated period of time begins to run shall not be included. The*

*last day of the period so computed shall be included unless it is a Saturday, a Sunday, or a legal holiday,* or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, *in which event the period runs until the end of the next day which is not one of the aforementioned days.*

(*Emphasis* added). Therefore, assuming actual notice on October 5 or 6, 1995, as Defendants argue, the one year statute of limitations would not commence until October 6 or 7, 1995. Moreover, because October 5 and 6, 1996 were a Saturday and a Sunday, respectively, the filing deadline for a claim arising on either October 5 or 6, 1995 would be October 7, 1996. Accordingly, the Court finds that under a standard of actual notice, Plaintiffs' October 7, 1996 Complaint is timely. *See also, Merriweather v. City of Memphis,* 107 F.3d 396, 398 n. 2 (6th Cir.1997).

### 2. *Inquiry Notice.*

Regardless of actual notice, Defendants assert that Plaintiffs were on inquiry notice of the alleged securities fraud on October 2, 1995, at the very latest. Consequently, they conclude that Plaintiffs' claims under Section 10(b) are time-barred. Plaintiffs, however, counter that: (1) the Court may not consider statute of limitations questions on a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss; (2) actual notice and not inquiry notice is the relevant standard for Section 10(b) claims; and (3) in the alternative, even under an inquiry notice standard, Plaintiffs' Complaint is timely because they lacked inquiry notice prior to October 6, 1995.

### a. *The Court May Consider Whether Plaintiffs' Complaint is Time–Barred on a Motion to Dismiss.*

■ As an initial matter, Plaintiffs, relying on *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994), *Nevada Power Co. v. Monsanto Co.,* 955 F.2d 1304, 1307 (9th Cir. 1992), and *Rebenstock v. Deloitte & Touche,* 907 F.Supp. 1059, 1065 (E.D.Mich.1995), contend that the Court cannot dismiss their Complaint as time-barred on a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss because the statute of limitations is an affirmative defense, and as a result, they are not required to negate it in their Complaint. Defendants dispute this assertion, arguing that the Court is free to entertain statute of limitations questions on a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss.

The Court agrees with Defendants for several reasons. First, *Nevada Power Co., supra,* and *Rebenstock, supra,* involved Motions for Summary Judgment under Fed.R.Civ.P. 56, and the courts there simply found that genuine issues of material fact prevented them from determining when the plaintiffs discovered, or should have discovered, the allegedly fraudulent conduct. *Nevada Power Co.,* 955 F.2d at 1307; *Rebenstock,* 907 F.Supp. at 1065.

Second, in *Tregenza,* the Seventh Circuit stated:

The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint. *Of course if he pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court.*

12 F.3d at 718 (*emphasis* added). Thus, the Seventh Circuit went on to note that "[a] complaint that on its face reveals that the *plaintiff's claim is barred by a statute of limitations* or repose *can be dismissed on a motion to dismiss,* in accordance with the principle noted above that a plaintiff can plead himself out of court...." *Tregenza,* 12 F.3d at 719 (*emphasis* added).

Finally, the Sixth Circuit has reached this same conclusion:

"Since [Fed.R.Civ.P.] 9(f) makes allegations of time material, however, *the defense of the statute may be raised on a motion to dismiss under [Fed.R.Civ.P.] 12(b)(6) when it is apparent from the face of the complaint that the time limit for bringing the claim has passed.*"

*Hoover v. Langston Equipment Associates, Inc.,* 958 F.2d 742, 744 (6th Cir.1992) (quoting 5 Wright and Miller, *Federal Practice*

*and Procedure,* § 1308, p. 695 (West 1990)) (*emphasis* added).

Accordingly, the Court finds that it is appropriate to consider whether Plaintiffs' Complaint is time-barred on a Fed.R.Civ.P. 12(b)(6) Motion to Dismiss because the Court can determine, as a matter of law, whether Plaintiffs have pled themselves out of Court by examining the Complaint itself, including those materials from which they quote extensively, provided that the Court accepts Plaintiffs' well-pleaded factual allegations as true. *Cf. Hoover, supra,* 958 F.2d at 744 *with Teagardener,* 909 F.2d at 949.

### b. *Inquiry Notice versus Actual Notice.*

Defendants assert that the Court should dismiss Plaintiffs' claims under Section 10(b) and Rule 10b–5 because they are barred by the one year statute of limitations that applies to these claims. Plaintiffs, however, contend that their claims are not time-barred because: (1) Defendants rely on an inquiry notice standard that is inapplicable to Section 10(b) and Rule 10b–5 claims and (2) alternatively, they were not on inquiry notice until October 6, 1995.

### i. *The Lampf Decision.*

The starting point for discussing the statute of limitations in Section 10–(b) and Rule 10b–5 cases is the Supreme Court's decision in *Lampf, supra.* Here, the Court granted *certiorari* to determine the proper limitations period for Section 10(b) and Rule 10b–5 claims because Section 10(b), under which Rule 10b–5 was promulgated, lacks a statute of limitations.

In resolving this question, the Court looked to other parts of the Exchange Act and "borrowed" a time limitation from a section that it found to be most analogous to the one at issue. Ultimately, the Court held that Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e), supplies the time period for the statute of limitations for Section 10(b) and Rule 10b–5 claims. *Lampf, supra,* 501 U.S. at 362, 111 S.Ct. at 2781–82. Section 9(e), and now as a result of *Lampf,* Section 10(b), requires that suits to enforce substantive provisions be brought "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Id.*

Thereafter, the Court addressed the plaintiff-respondents' contention that, whatever limitations period is applicable to § 10(b) claims, that period must be subject to the doctrine of equitable tolling. In answering this argument, the Court first summarized the equitable tolling doctrine:

> "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."

*Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782. Then the Court turned to the application of the doctrine and found that:

> the equitable tolling doctrine is fundamentally inconsistent with the 1–and–3–year structure.
>
> The 1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3–year limit is a period of repose inconsistent with tolling. One commentator explains: "[T]he inclusion of the three-year period can have no significance in this context other than to impose an outside limit." Because the purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.

*Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782 (citations omitted).

### ii. *The Relevant Courts of Appeals Decisions.*

The relevant question for this case becomes, therefore, whether the "discovery of the facts constituting the violation" is actual notice of those facts, as Plaintiffs argue, or inquiry notice of those facts, as Defendants contend. Plaintiffs assert that on its face the Section 9(e) statute of limitations is an actual notice rule, and therefore, that Section 10(b) is as well. Defendants, however, point to Courts of Appeals decisions that have applied inquiry notice to the statute of limitations for

Section 10(b) and Rule 10b–5 claims post–*Lampf.*

The Court begins its analysis with Chief Judge Posner's opinion in *Tregenza:*

Section 9(e), read literally, requires actual knowledge to set the statute of limitations running. The plaintiff must know "the facts constituting the violation," not merely enough facts to make a reasonable person suspicious and start looking for the facts constituting the violation. On the same day that section 9(e) was enacted, Congress amended section 13 of the Securities Act of 1933 . . . to make the limitations and repose periods the same as those of the Securities Exchange Act of 1934. But section 13 bars suit "unless brought within one year after the discovery of the untrue statement or the omission *or after such discovery should have been made by the exercise of reasonable diligence.*" 15 U.S.C. § 77m (emphasis added). And the Supreme Court held in *Lampf* that it is section 9(e) of the 1934 Act, not section 13 of the 1933 Act, that supplies the statute of limitations for Rule 10b–5 suits.

When section 9(e) was enacted in 1934, there was no Rule 10b–5 . . . Congress could not have known when it enacted section 9(e) that this section would someday provide the statute of limitations for a wide range of securities frauds unrelated to the market manipulations forbidden by section 9 . . . It is an impermissible leap to infer that Congress *decided* that inquiry notice should not be a feature of suits brought to enforce the as yet unforeseen Rule 10b–5 . . . Rules making the accrual date the date of discovery, of which actual knowledge and inquiry notice are variants, usually are judicial grafts. Even sixty years ago, when the federal securities laws were enacted, these grafts were common. When Congress knew it was dealing with a statute of limitations for fraud, as in section 13 of the 1933 Act, it took care to provide for inquiry notice explicitly. But that does not mean that it intended to prevent the courts from grafting such a provision onto a statute of limitations that lacked it, should that statute of limitations someday become applicable to fraud cases.

Sections 11 and 12(2) of the 1933 Act, on the one hand, and Rule 10b–5 under the 1934 Act, on the other, differ only in details. If, as Congress plainly believed, inquiry notice makes sense for fraud in the sale of stock, it makes sense when fraud is challenged under the rule rather than under the statutes. It is not, we repeat, as if Congress decided to distinguish between the two forms of claim so far as the limitations period was concerned. It did not know that section 9(e) of the 1934 Act would someday be applicable to the same type of fraud claim for which section 13 of the 1933 Act supplied the limitations period.

The precise question, then, is not: Does section 9(e) incorporate the rule of inquiry notice? It is: Are courts free to apply to the section the judge-made doctrine of inquiry notice, long applied in fraud cases outside as well as inside the securities field? Nothing in the language, history, or purpose of section 9(e) forecloses so modest and traditional an exercise of judicial creativity . . .

The utility of inquiry notice and hence the propriety of our interpretation may seem diminished by the presence of a three-year statute of repose. Not so—for section 13 of the 1933 Act has the same three-year statute of repose yet Congress wrote inquiry notice into the one-year statute of limitations in that section. Three years is an age in the stock market. If the suspicious investor had a wide choice of times at which to sue within a three-year period rather than being required to sue no more than one year after the earliest possible date, the opportunistic use of federal securities law to protect investors against market risk would be magnified . . . This tactic is discouraged by the doctrine of inquiry notice, which we hold is applicable to Rule 10b–5 suits.

12 F.3d at 721–22 (citations omitted).

Several other Courts of Appeals have reached this same result, finding that inquiry or constructive notice is the appropriate standard for the Exchange Act statute of limitations provisions. *Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993); *Dodds v. Cigna*

*Securities, Inc.,* 12 F.3d 346, 350 (2d Cir. 1993); *Anixter v. Home–Stake Production Co.,* 947 F.2d 897, 898–99 (10th Cir.1991); *Olcott v. Delaware Flood Company,* 76 F.3d 1538, 1549 (10th Cir.1996); *Howard v. Haddad,* 962 F.2d 328, 330 (4th Cir.1992); *Brumbaugh v. Princeton Partners,* 985 F.2d 157, 162 (4th Cir.1993). In so concluding, many of these Courts observed that it is a general principle of federal law that the determination of when a cause of action accrues is an objective test, i.e., when the plaintiff discovered or should have discovered in the exercise of reasonable diligence the facts giving rise to the claim. *Anixter, supra,* 947 F.2d at 899 n. 5; *Menowitz, supra,* 991 F.2d at 40–41; *Dodds, supra,* 12 F.3d at 350.

Moreover, building upon the *Tregenza* Court's reasoning, the Tenth Circuit has stated the following:

> In deciding to analogize the statute of limitations under § 10(b) of the 1934 Act to one of the express limitary periods found in the 1933 and 1934 Acts, the Court, in [*Lampf*] noted that each express cause of action included explicit and similar limitations periods . . .
>
> Despite the Court's recognition of the substantial similarity of the wording of these express limitary periods, plaintiffs contend the slightly different wording of § 9(e), in fact, calls for "actual notice" while the language of § 13 requires only inquiry notice. We find no distinction; nor did the Court in [*Lampf*].
>
> Instead, in [*Lampf*], the Court observed, "Although not identical in language, all these [express statutes of limitations] relate to one year after discovery and to three years after violation." [*Lampf,* 501 U.S. at 351–55, n. 2] 111 S.Ct. at 2777, n. 2. When the Court selected § 9(e), it did not necessarily indicate a preference for the type of notice of the violation but sought a "governing" standard to link the implied § 10(b) remedy to those express securities causes of action which uniformly require one year after notice of the violation and not more than three years after the violation.

*Anixter, supra,* 947 F.2d at 899.

Although the Sixth Circuit has not spoken on the precise issue of actual or inquiry notice with respect to the statute of limitations for Section 10(b) and Rule 10b–5 post–*Lampf* claims, it has found inquiry notice to be the general federal rule and has applied it to a Section 10(b) and Rule 10b–5 claim where state law provided the statute of limitations. *Freeman v. Laventhol & Horwath,* 34 F.3d 333, 341 (6th Cir.1994). In *Freeman,* the statute of limitation for the plaintiffs' Rule 10b–5 claim was borrowed from state law because the claim was commenced prior to the *Lampf* decision. Nevertheless, the Court's decision to apply inquiry notice to the Rule 10b–5 claim and to then dismiss it as time-barred is still instructive because of the following passage:

> Although a federal court looks to state law to determine the length of the statute of limitations, it must apply federal law to determine the date on which a statute of limitations in a federal securities case began to run. Under federal law, a statute of limitations begins to run when "the fraud is or should have been discovered."
>
> In this case, . . . the district court concluded that: "a reasonably diligent person should have discovered . . . the alleged fraud on or around December 1, 1985. . . ." We find that the district court did not err in finding that plaintiffs' § 10(b) claims accrued on December 1, 1985.

*Freeman,* 34 F.3d at 341. In a post–*Lampf* context where federal law now provides the statute of limitations, the Court can find no reason why the Sixth Circuit would not continue to apply the inquiry notice standard, particularly in light of the trend in the other Courts of Appeals.

█ The Court agrees with the analysis of these decisions and, therefore, joins its colleagues from the other circuits in concluding that, as a general rule, inquiry notice is the standard for federal statute of limitations, particularly in the fraud context, and notes in particular that there is nothing in *Lampf* to suggest the contrary. Therefore, the Court finds that the one-year statute of limitations which applies to Section 10(b) and Rule 10b–5 claims commences when the victim of the alleged fraud discovered or should have discovered the alleged fraud.

### 3. Plaintiffs Should Have Known of the Alleged Fraud Prior to October 5, 1995.

Having found that the one-year statute of limitations for Section 10(b) and Rule 10b–5 claims commences when the plaintiff discovered or should have discovered the alleged fraud, the Court will now examine that question in this case.

#### a. The Inquiry Notice Analysis.

· [5] To determine if, and when, Plaintiffs should have known of Defendants' alleged fraud, the Court must decide: (1) whether Plaintiffs knew or should have known of the possibility of fraud (so-called "storm warnings"), and, if so, (2) whether Plaintiffs exercised due diligence in attempting to determine the cause and scope of the fraud. *Harner v. Prudential Securities, Inc.*, 785 F.Supp. 626, 633–34 (E.D.Mich.1992), *aff'd*, 35 F.3d 565 (6th Cir.1994); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987); *Brumbaugh, supra*, 985 F.2d at 162; *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir.1995); *Dodds, supra*, 12 F.3d at 350.

The first prong of this test is an objective one vis, whether the reasonable investor would have been alerted to the storm warnings, while the second prong is subjective vis, whether according to his or her abilities and the circumstances of the alleged fraud, the investor exercised due diligence in verifying the existence of a fraud. *Harner, supra*, 785 F.Supp. at 634; *Maggio, supra*, 824 F.2d at 128. The Court reiterates its observation in *Harner* that "an investor could notice 'storm warnings' and then diligently investigate only to be hindered in his attempt to discover the fraud. In such a case . . . the date of accrual would be prolonged." *Harner*, 785 F.Supp. at 633 n. 14. *See also, Fujisawa Pharmaceutical Company, Ltd. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir.1997) (plaintiff on inquiry notice will not be barred by statute of limitations unless he is able to investigate, discover the fraud, and file a claim within the statute of limitations). However, if the investor noticed or should have noticed the storm warnings and fails to inquire further with reasonable diligence, knowledge of the alleged fraud will be imputed to him or her. *Dodds, supra*, 12 F.3d at 350.

■ For the purposes of this inquiry, the Court considers a "storm warning" any substantial or concrete indication of serious problems ahead for the company which were reflected in either the Form 10–K Report, the Prospectus, or subsequent press releases and reports which could reasonably be considered contrary to the optimistic statements and predictions that Plaintiffs' claim were fraudulent.

As indicated above, Plaintiffs allege that Defendants misrepresented or concealed various facts concerning the strength of NEI's business in Japan in 1995, the commercial and technical success of its NELink 1000 product, and the expected market success of its products in the United States and Europe in 1995 and 1996. Plaintiffs claim that because of these factual misrepresentations, the forecasts and projections made by Defendants concerning NEI of strong revenue growth in the United States and Europe in 1995 and 1996, for continued strong revenues from Japan in 1996, and for projected earnings per share of $.24–$.26 in 1995 and $.37–$.38 in 1996 had no reasonable basis in fact. (See Plaintiffs' Complaint, ¶¶ 56, 77.)

Defendants, however, contend that all of the risks and circumstances, and their significance, were disclosed and made known to the market well before October 5, 1995. In particular, Defendants point to the March 31, 1995 Form 10–K Report; the April 23, 1995 and May 18, 1995 preliminary and final Prospectus; the June 1, 1995 Unterberg Harris Report; the June 19, 1995 Furman Selz Report; the July 12, 1995 NEI press release; the July 13, 1995 Furman Selz Report; the August 29, 1995 Furman Selz Report; and the drop in the stock price between October 1 and October 4 as word of NEI's third quarter results leaked into the market. Plaintiffs counter that neither the statements in these documents (including the risks and circumstances that they identified), nor the drop in the stock price, were sufficient to give an investor notice of fraud.

### b. *The Applicable Case Law.*

The Second Circuit and the Fourth Circuit have examined the issue of storm warnings in circumstances analogous to this case. In *Dodds, supra,* 12 F.3d 346, the plaintiff brought claims under §§ 10(b), 9, and 20 of the Exchange Act, asserting that, in order to make higher commissions, the defendants induced her to invest in limited partnerships that were unsuitable for her because of their risk and illiquidity. However, the Second Circuit found that:

the commissions, the risk, and the illiquidity of investments in the limited partnerships were clearly disclosed in the prospectuses. For example, the prospectus for the Technology Funding Secured Investors III limited partnership has a clearly marked seven-page section entitled "Risk Factors." Within this section, under the subsection "Lack of Liquidity," the prospectus states, "There is no current public or secondary market for the [limited partnership] Units nor is one likely to develop." The section is strewn with warnings about the risks inherent in the limited partnership's intended business—venture capital. Finally, a separate sub-section . . . clearly explains the commissions the broker-dealer receives upon sales of units in the limited partnership.

The prospectus for the Berry and Boyle Development Partners III limited partnership is equally clear. The prospectus on the first page states in bold, all-capital, oversized letters set off from the rest of the text, "THE SECURITIES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK." Immediately below this warning appears a table with the selling commissions depicted. The second page, under a description of "Risk Factors," states, "No public market for the [limited partnership] Units exists or is expected to develop . . ."

These warnings, and similar ones in the other prospectuses, were sufficient to put a reasonable investor of ordinary intelligence on notice of the commissions, the risk, and the illiquidity of these investments . . .

*Dodds, supra,* 12 F.3d at 350. Accordingly, the court affirmed the District Court's dismissal of Plaintiffs' claims, concluding that the prospectuses put the plaintiff-investor on inquiry notice more than one-year prior to when she filed her complaint, thereby running afoul of the statute of limitations. *Dodds,* 12 F.3d at 353.

In *Brumbaugh, supra,* 985 F.2d 157, the plaintiff purchased one unit in a limited partnership from the defendant partnership. The partnership was to own and operate commercial properties while creating tax losses to shelter the income of the limited partners. The Internal Revenue Service ("IRS"), however, audited the partnership and disallowed the tax deductions. Thereafter, the plaintiff brought state and federal claims to recover his investment and other related damages. The Fourth Circuit affirmed the District Court's dismissal of, *inter alia,* the plaintiff's Section 10(b) and Rule 10b–5 claims, finding that:

Because the prospectus sufficiently disclosed the risks that subsequently led the IRS to disallow the deductions, we believe that the investor was on inquiry notice and that the statutory limitations period began to run on the date of the sale of the limited partnership unit . . .

*Brumbaugh,* 985 F.2d at 159.

The Fourth Circuit specifically delineated the factors which provided inquiry notice, noting that the defendant had marketed the limited partnership units via a Private Placement Memorandum ("PPM") which was received by all prospective investors and that the PPM began with several warnings, including: "THIS OFFERING INVOLVES A SUBSTANTIAL DEGREE OF RISK (INCLUDING RISKS RELATING TO BENEFITS DERIVED FROM TAX ADVANTAGED INVESTMENTS)." *Id.* at 159. Moreover, a Risk Factors section further defined these warnings. *Id.* at 160. In particular, five subsections explained the reasons why the IRS may not grant the partnership favorable tax treatment and why this outcome would have adverse effects on any investment in the partnership. *Id.*

Consequently, Judge Wilkinson found that:

The PPM contained a host of prior warnings making it plain that [the plaintiff] was

purchasing, to put it mildly, a highly speculative investment. [The plaintiff] is charged with constructive knowledge of the contents of the PPM, which was incorporated by reference into the complaint. The PPM specifically warned of the possibility that the IRS would disallow the tax deductions that flowed from the investment. That risk came to pass—and now, in hindsight, [the plaintiff] claims that he was defrauded.

*Brumbaugh,* 985 F.2d at 162.

Additionally, the Court explained that equity did not suggest a tolling of the statute of limitations was appropriate because a comparison of the plaintiff's complaint and the PPM showed that the plaintiff was on inquiry notice of the violations that he alleged. Specifically, the complaint alleged that the PPM failed to disclose:

a) that the partnership would be taxed as a corporation rather than a partnership. (The PPM warns: "no assurance can be given that the Partnership would not be treated as an association taxable as a corporation.")

        \*    \*    \*    \*    \*    \*

b) that investors should anticipate a negative rate of return. (The PPM warns: "NO WARRANTY IS OR CAN BE MADE AS TO THE FUTURE OPERATIONS OR OF THE AMOUNT OF ANY FUTURE INCOME OR LOSS FROM THE PARTNERSHIP.")

        \*    \*    \*    \*    \*    \*

i) that the forecasts and the opinions were untrue. (The PPM warns: "NO REPRESENTATION OF ANY KIND IS MADE RESPECTING THE FUTURE ACCURACY OR COMPLETENESS OF THESE FORECASTS," and "THE CONCLUSIONS REACHED IN THE TAX OPINION ARE RENDERED WITHOUT ASSURANCE THAT SUCH CONCLUSIONS HAVE BEEN OR WILL BE ACCEPTED BY THE SERVICE OR THE COURTS.")

*Brumbaugh,* 985 F.2d at 162–63.

In conclusion, therefore, the Court stated that:

The prospectus warned of the possible occurrence of each of the events that [the plaintiff] now alleges were fraudulently concealed. The facts on which the IRS relied in disallowing the deduction, and which [the plaintiff] parrots in his complaint, were discussed in the PPM. The PPM warns that the IRS might draw the very conclusions that it did in disallowing the deductions ... Faced with numerous warnings of an investment's potential risk, the investor cannot simply wait to see if those risks materialize before filing suit. We hold, therefore, that when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims and the limitations period begins to run....

*Brumbaugh,* 985 F.2d at 163.

The approach of these appellate courts is similar to that which this Court has applied. In *Harner, supra,* this Court granted the defendants' motion for summary judgment on a Racketeer Influenced and Corrupt Organizations Act ("RICO") complaint which alleged that the defendants, knowing that the aircraft market was very bad, marketed limited partnership units, which were to purchase, lease, and re-sell business aircraft, with promises of favorable returns. The Court, however, found that the claims were barred by the statute of limitations because the plaintiff had inquiry notice of the alleged fraud well outside of the statute of limitations period. 785 F.Supp. at 636.

In reaching this conclusion, the Court found storm warnings on several fronts. First, the disclaimers in the Prospectus which described "an uncertain and potentially difficult investment," were "sufficiently contradictory with, among other[ ] [statements in the Prospectus], the claim that there exist[ed] 'an excellent market for leasing aircraft' to put a reasonable investor on notice." *Harner,* 785 F.Supp. at 635. Second, the Prospectus included a detailed discussion of several separately identified risks which "were so specific and comprehensive as to indicate to a reasonable investor that additional inquiry would be necessary, even absent any indications by the [d]efendants that the market outlook was optimistic." *Id.*

Third, the Prospectus made it clear that this opportunity was only appropriate for investors who could risk losing their entire investment. *Id.* at 636. Finally, on 3 different occasions subsequent to the Prospectus and outside of the statute of limitations period, the defendants sent letters to the plaintiffs which indicated that the partnership was failing and that market conditions were poor. *Id.*

In *Levin v. Arneault*, 1989 WL 223014 (W.D.Mich.1989), the District Court dismissed claims under Section 12(2) of the Securities Act because the plaintiffs had inquiry notice of the basis of their action outside of the statute of limitations period. The plaintiffs alleged that in the offer and sale of interests in oil and gas limited partnerships the defendants falsely represented that the drilling locations were developmental locations; that defendants would use their expertise to perform drilling and operating service; that such services would be superior to those commonly provided; and that they could expect a return in excess of the average returns for similar oil and gas wells. *Levin,* 1989 WL 223014 at *5. Moreover, the plaintiffs allege that defendants knowingly and falsely represented that drilling was progressing at a rate faster than was actually occurring and that the wells produced at a rate greater than the actual date of production. *Id.*

The Court, however, found that the prospectuses for the partnerships specifically warned investors that: (1) the securities have an extremely high degree of risk; (2) the securities are only appropriate for investors who can afford to lose all of their investment; (3) the IRS may find that the partnership is an association and deny it the favorable tax treatment upon which the investment was predicated; (4) the predicted proceeds from the partnership are estimates only; and (5) the partnership may not drill upon the sites described. *Id.* Moreover, accompanying documents required the investors to verify that they understood the risks of this investment and that no representations or warranties regarding the success of the partnership could be made. *Id.* at *6. Therefore, the Court found that based on the discrepancies

between the prospectuses, the accompanying documents, and the defendants' alleged misrepresentations, the plaintiffs had sufficient information to put them on inquiry notice of their claims at the time of the sale of the securities. *Levin, supra,* 1989 WL 223014 at * 6.

Finally, in *Tabankin v. Kemper Short–Term Global Income Fund,* 1994 WL 319185 (N.D.Ill.1994), the plaintiffs brought federal securities fraud claims, including Section 10(b), which alleged that although the defendants characterized the investment funds at issue as conservative, the funds declined by 20% when some European countries devalued their currency. Thus, the plaintiffs argued that when the defendants made the initial offering they knew or should have known of this risk, and that the defendants did not engage in prudent investment management; misrepresented the funds as conservative investments; and omitted disclosure of the magnitude of the risk of devaluation.

In addition to finding that the alleged misrepresentation—a "conservative" investment that was prudently managed—was not a material misrepresentation, the Court also found that the plaintiffs' claims were time-barred because the risk of devaluation were disclosed in the prospectus and other materials. Specifically, the Court noted that:

> While broad, general representations were made about "prudent investment management" and "conservative investment," the specific details about the investment vehicles and the risks attendant thereto gave meaning to those otherwise amorphous terms. The prospectus clearly identified the risk of devaluation.

*Tabankin,* 1994 WL 319185, *2. Then, relying on *Brumbaugh, supra,* the Court stated that "the risks were disclosed in the prospectuses, as well as in other materials; thus, ... we find that the statute of limitations is an alternative basis on which to dismiss the federal securities law claims of the plaintiffs."

Plaintiffs have attempted to distinguish these cases from the instant matter by characterizing the various disclaimers and risks in the Form 10–K and the Prospectus here as "bland and routine," whereas the circum-

stances in the above matters were akin to actual notice. Moreover, Plaintiffs find these cases inapposite because Plaintiffs herein do not allege that the risk disclaimers failed to disclose unsuitable investments. Finally, Plaintiffs point to the recent decision in *Fugman v. Aprogenex*, 961 F.Supp. 1190 (N.D.Ill.1997).

With respect to the Risk Factors in the NEI Form 10–K and the Prospectus, the Court does not find them to be bland and routine. Rather, they are highly specific and would certainly give a prudent investor a reason to pause. For example, with respect to the NELink–1000, the Prospectus states that:

> There can be no assurance that the Company will be successful in identifying, managing, developing, manufacturing or marketing product enhancements or new products that respond to technological change or evolving industry standards, that the Company will not experience difficulties that could delay or prevent the successful development, introduction or marketing of such products, or that its new products and product enhancements will adequately meet the requirements of the marketplace and achieve market acceptance in Japan or elsewhere. The Company's business and operating results would be materially and adversely affected if the Company were to be unsuccessful, or to incur significant delays, in developing and introducing such new products or enhancements. The Company introduced the NELink–1000 in March 1995 to meet perceived market demand in Japan for a product designed solely as a telecommunications device. There can be no assurance that the NELink–1000 will adequately meet the requirements of the marketplace and achieve market acceptance in Japan or elsewhere. In the past, the Company has experienced delays in product release and introduction, and there can be no assurance that such delays will not occur in the future ...

(May 18, 1995 NEI Prospectus, NEI's Ex. B). Moreover, in regard to its business in Japan, the Form 10–K Report states that:

**Dependence on Single Customer.** In 1992, 1993, and 1994, sales to Soliton Systems, K.K. ("Soliton"), the exclusive distributor of the Company's products in Japan, accounted for approximately 54%, 79%, and 88%, respectively, of the Company's net sales. The Company expects this sales concentration to continue at least through 1995. A majority of such sales are attributable to NE ISDN Router products. Under the Company's agreement with Soliton (the "Soliton Agreement"), Soliton alone may distribute the Company's products in Japan; however, Soliton may sell products of other companies, including those of the Company's competitors ... Further, the Soliton Agreement expires in April 1997 and there can be no assurance that it will be renewed, or, if renewed, that its terms will be as favorable ... Any de-emphasis of the Company's products by Soliton, termination of the Soliton Agreement, modifications to terms less favorable to the Company, or any operational or financial failure of Soliton, could have a material adverse effect on the business, results of operations and financial condition of the Company ...

The Company believes that Soliton is highly dependent on a limited number of customers. Any delays, changes in purchasing patterns, termination of programs or competition could have a material adverse affect on Soliton and, in turn, the Company. There can be no assurance that Soliton or its customers will continue to place orders with the Company. In addition, the sales cycles of the Company's products are relatively long and often dependent upon factors such as the size and timing of Soliton's customer's projects. The Company's planned product shipments for a single customer project can be a significant portion of a quarter's revenue, and delays in the timing or the Company's ability to meet delivery requirements could have a material adverse effect on the Company's results of operations. In addition, decisions by customers to build inventory and sell from inventory could lead to reductions in demand, which could have a material adverse affect on the

Company's business, financial condition and results of operations.

(Mar. 31, 1995 Form 10–K, NEI's Ex. A (**emphasis** in the original)).

With respect to its business in the United States and Europe, both the Form 10–K and the Prospectus plainly state that NEI has little to no business in these countries and that its prospects for success in those markets was uncertain and contingent on several factors. (NEI's Ex. A. and B). Finally, these documents also describe in detail why NEI's quarterly revenues may be subject to tremendous fluctuation, including the significance of one large order from NTT in one period and the absence of any business from NTT in another. *Id.*

In their Response, Plaintiffs attempt to narrowly distinguish cases like *Dodds* and *Brumbaugh,* arguing that they involved actual notice or that their reasoning is limited to allegations that the risk disclaimers failed to disclose unsuitable investments. These arguments are unpersuasive. First, *Dodds* and *Brumbaugh* were plainly discussing inquiry notice, not actual notice. *Dodds,* 12 F.3d at 353; *Brumbaugh,* 985 F.2d at 159. Second, the logic of these cases is quite clear and is not limited to the failure to disclose unsuitable investments: plaintiffs are on inquiry notice with respect to securities frauds claims from the date upon which they learn the specific risks and circumstances which later form the basis of their complaint. *Dodds,* 12 F.3d at 350; *Brumbaugh,* 985 F.2d at 163. *See also, Law v. Medco Research Inc.,* 113 F.3d 781, 785 (7th Cir.1997) ("Suspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded, may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud"); *Fujisawa, supra,* 115 F.3d at 1335 (same).

Finally, the Court does not find the *Fugman* decision relevant to this case. In *Fugman,* the defendant sought to develop a diagnostic test system to identify prenatal abnormalities and diseases. Given that its system would be cheaper, more reliable, and safer than the available alternatives, the company expected high profit margins and a large sales volume when the system reached the market.

In its written public disclosures, the defendant expressed considerable confidence in its ability to deliver a marketable product in the near future. Moreover, oral statements by defendant's officials regarding the company's prospects were even more optimistic and repeatedly assured investors that the system would be commercially viable. Nevertheless, the defendant's publications "repeatedly emphasized that the company's success was contingent on the success of its research and development efforts" and that " 'there can be no assurance that there will not be additional delays in the enrichment system ... or that the ·enrichment system will ever be successfully developed by the Company.' "

However, in the following months, a report issued by a securities company suggested that the defendant had not yet completed an essential component of the system. *Fugman,* 961 F.Supp. at 1193. In response, the plaintiffs' broker made inquiries of the defendant's officials, who assured him that the problems with the system had been fixed and reiterated their claims that the system would be introduced into the European market shortly. *Fugman, supra,* 961 F.Supp. at 1193. Moreover, these officials "dismissed the cautionary language in their public disclosures as inaccurate and indicated that the language existed only because it was 'required by the lawyers.' " *Id.*

In its motion to dismiss, the defendant argued that the plaintiffs' claims were time-barred since the cautionary language in its written publications would have caused a reasonable person to doubt the company's subsequent representation that the system was fixed and ready for market. The Court, however, found this argument unpersuasive because in its view: (1) there was really no contradiction between the defendant's initial warnings regarding the riskiness of the venture and its subsequent claim that the system was marketable; and (2) it was reasonable for the investors to rely on the defendant's representation that the problem with the system had been fixed because the securities firm's information may have grown stale and it was logical to be-

lieve defendant's scientists instead of some outside investment bankers. *Id.* at 1198–99. Put simply, the *Fugman* Court found active misrepresentation.

Here, in its Form 10–K and its Prospectus, NEI identified and discussed at length why any investment with it should be weighed carefully—single customer in Japan; little or no market in Europe and the United States; fluctuations in quarterly results; and uncertainties in developing and introducing a new product. These statements and circumstances were plainly at odds with the bold and optimistic language about these matters that appeared in other parts of the Form 10–K and the Prospectus and that is found in the Annual Report. Moreover, the subsequent press releases made no efforts to dispel or refute these previously identified risks and circumstances, and in some instances, as explained below, indicated that the risks had materialized.

Relying on these differences, therefore, the Court finds *Fugman* to be inapposite. In *Fugman,* the defendants specifically and emphatically denied the existence of the previously disclosed risk in response to a pointed inquiry by the plaintiffs' broker. Thus, any inquiry notice that the plaintiffs had was quashed by the defendant's subsequent statements, thereby exhausting any due diligence obligation. None of these circumstances are present in this case.

### c. *Applying the Case Law to the Facts Here.*

In view of this decisional precedent, the Court finds that securities fraud plaintiffs will be deemed to be on inquiry notice from the date that they learned or should have learned of the risks and circumstances which form the basis of their complaint, *Dodds,* 12 F.3d at 350; *Brumbaugh,* 985 F.2d at 163, provided that the defendants do not later directly refute the risks, *Fugman,* 961 F.Supp. at 1198–99, and that the risks and circumstances are contradictory to the defendants "rosy predications" or other alleged misstatements, *Harner,* 785 F.Supp. at 634.

Here, Plaintiffs, relying on optimistic statements and predictions in the Form 10–K, the Prospectus, the Annual Report and the June, July, and September press releases

regarding NEI's business in Japan, the United States, and Europe, and the introduction of the NELink–1000, claim that the Defendants fraudulently misstated or omitted facts concerning NEI's single customer market in Japan in 1995, the commercial and technical success of its principal product, and the company's expected market success in the United States and Europe in 1995 and 1996, and that all of these alleged misrepresentations rendered Defendants' the forecasts and projections of strong revenue growth in the United States and Europe in 1995 and 1996, for continued strong revenues from Japan in 1996, and for projected earnings per share in 1995 and 1996 without any basis in fact.

However, all of the risks and circumstances concerning NEI, its limited markets, its products, and investment in the company were clearly disclosed in NEI's Form 10–K and Prospectus and the subsequent press releases and reports. Specifically, in the Form 10–K and Prospectus, NEI indicates that any investment with it involves a high degree of risk and should be considered only after a careful review of its Risk Factors sections. In these sections, which are virtually identical in both documents, NEI stated that:

(1) It was dependent on a single distributor and a single customer in Japan; the terms of the distribution agreement were not favorable; its business in Japan was subject to the whims of Soliton and NTT; the distribution agreement may not be renewed; and based on the foregoing, any changes in its current position in Japan would have material adverse consequences for the company;

(2) It could offer no assurances regarding the development, manufacture and sale of new products, which are subject to delay, technical difficulties, or lack of market acceptance, and that any of these circumstances could adversely affect the Company's operating results;

(3) There was virtually no established market for its products in the United States or Europe, but that these markets would be the focus of significant

marketing efforts, the results of which were speculative and could adversely impact the company because of increased marketing costs.

(4) Its profitability (and as a result its stock price) on a quarterly basis is subject to fluctuations due in part to the unpredictable purchasing patterns of its sole Japanese customer.

(*See* NEI's Ex. A and B).

On June 12, 1995, NEI explained its second quarter revenue increase and the associated shipment to NTT:

> The increase was due primarily to sales of the Company's products to support a large internal networking project at NTT, the Japanese telecommunications carrier. The project accounted for approximately 57 percent of the Company's sales to Soliton in the second quarter. The Company currently expects that this project will be completed in the fourth quarter of 1995.

(Complaint, ¶ 45). Moreover, in light of this, Furman Selz stated the following in its July 13, 1995 Report:

> [B]ecause the company has not yet received any firm commitments for additional business from NTT, we are revising our estimate for Japan downward....

(Furman Selz Report dated July 14, 1995, Furman Selz and Unterberg Harris' Ex. E, pp. 1–2).

On July 27, 1995, Furman Selz stated the following with respect to NEI's relationship with Pacific Bell:

> Yesterday, Network Express announced the start-up of a telecommuting trial project with Pacific Bell ... While this project is not expected to generate any significant

revenue for [NEI] this year, if Pacific Bell chooses to roll out the product throughout their entire company, there could be a material impact for [NEI] in 1996.

(Furman Selz July 27, 1995 Report, Furman Selz and Unterberg Harris' Ex. F, p. 1).

With respect to the NELink–100, the June 1, 1995 Unterberg Harris Report states that:

> Network Express' most recent product, the NELink–1000, can be placed at a client site that needs more than 2 connections but less than 8 connections.

(June 1, 1995 Unterberg Harris Report, Furman Selz and Unterberg Harris' Ex. C, p. 13). Similarly, the June 19, 1995 Furman Selz Report declares that "[t]he company does not make a single-line modem that connects directly to a PC...." (Furman Selz June 19, 1995 Report, Furman Selz and Unterberg Harris' Ex. D, p. 9). Finally, an article in "a national computer networking industry magazine" which was released prior to October 6, 1995 confirmed that the NELink–1000 did not compare favorably with "direct remote access products designed for end-user applications." (*See* October 6, 1995 Press Release, NEI's Ex. C, pp. 1–3).

Therefore, as the Form 10–K, the Prospectus, and the subsequent press releases and research reports make clear, Defendants identified, explained, and disclosed the risks and circumstances which underlie Plaintiffs' fraud claims well before October 1995, despite their optimistic predictions to the contrary. Accordingly, the Court finds that Plaintiffs were on inquiry notice outside of the statute of limitations period.[4] Despite this notice, however, Plaintiffs' Complaint does not allege that they engaged in any type of due diligence investigation.[5] Rather, the

---

4. In reaching this conclusion, the Court does not rely on the stock price drop in early October, although the Court notes that a steep decline in stock price in conjunction with other storm warnings may in some circumstances also trigger inquiry notice. *See LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 446–47 (7th Cir.1995). Here, the initial drop could simply have been a momentary aberration which is common to most stocks. Indeed, the Court notes that on October 5, 1995, after the initial decline, the stock briefly recovered at the closing.

5. In a recent decision, *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363 (7th Cir.1997), the Seventh Circuit stated that "inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (*whether or not actually exercised*), to ascertain the information needed to file suit." *Marks*, 122 F.3d at 368 (*emphasis* added). As the record here and the Court's analysis demonstrates, Defendants identified, explained, and disclosed the risks and circumstances which Plaintiffs rely on as indicia of fraud well before October 1995. To the extent that the Seventh Circuit now permits securities fraud plaintiffs to ignore storm warn-

investors seemed to move blithely ahead, oblivious to the danger signals.

Accordingly, the Court finds that Plaintiffs' Section 10(b) and Rule 10b–5 claims are barred by the statute of limitations. As a result, Plaintiffs' Section 20(a) claims must also be dismissed because to maintain the Section 20(a), 15 U.S.C. § 78t, claims Plaintiffs need a predicate Section 10(b) or Rule 10b–5 claim. *Jackson National Life Insurance Company v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994).

Reflecting upon the facts of this case, the Court cannot help but be reminded of the eternal optimism of man in affairs of both the heart and the pocketbook that often blind him to what should be obvious obstacles and pitfalls. Just as an ardent suitor will embark upon a clearly ill-fated romance, seeing only sunshine and sweetness ahead, oblivious to the warnings of his friends, investors see only the pot of gold at the rainbow's end without heeding the danger and warning signs clearly marked in the road on the way to the end of that rainbow. Unfortunately, the world is not always kind to the love-struck romantic and the optimistically enthusiastic investor. As the songwriter Paul Simon ruefully observed: "A man hears what he wants to hear and disregards the rest." [6]

Of course, once lawyers get involved, the warning signals are relativized, trivialized and transmogrified into seeming insignificance. However, even the most creative legal slight-of-hand cannot completely deflect focus away from the reality of the kinds of

brightly flashing neon warning signs that were evident here.

### C. *The Sufficiency of Plaintiffs' Pleadings.*

Although the statute of limitations itself bars Plaintiffs' claims, the Court will nevertheless address Defendants' arguments regarding the sufficiency of Plaintiffs' pleadings. Here, Defendants argue that under Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u–4(b)(2), the Complaint fails to plead the circumstances of fraud with particularity.

#### 1. *The Required Prima Facie Case under Section 10(b) and Rule 10b–5.*

At the outset, the Court notes that to make out a violation of Rule 10–5, which implements Section 10(b), a plaintiff must establish the following elements:

(a) a misrepresentation or omission by the defendant;

(b) that the misrepresentation or omission related to a material fact;

(c) a purchase or sale of a security in connection with the fraudulent device;

(d) scienter on the part of the defendant;

(e) justifiable reliance by the plaintiff on the defendant's statements, or fraud on the market [7];

(f) damages resulting from the misrepresentation or omission.

*See, e.g., Greenberg v. Compuware Corp.*, 889 F.Supp. 1012, 1015 (E.D.Mich.1995).

> I am just a poor boy
> Though my story's seldom told,
> I have squandered my resistance
> For a pocketful of mumbles,
> Such are promises
> All lies and jest
> Still, a man hears what he wants to hear
> And disregards the rest.

---

ings and relieves them of their burden of making any inquiries in the face thereof, this Court must respectfully disagree. This approach is against the clear weight of precedent, *Whirlpool, supra,* 67 F.3d at 609; *Dodds, supra,* 12 F.3d at 350; *Brumbaugh, supra,* 985 F.2d at 163; *Maggio, supra,* 824 F.2d at 128; *Cook v. Avien, Inc.,* 573 F.2d 685, 697 (1st Cir.1978); *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *General Builders Supply Co. v. River Hill Coal Venture,* 796 F.2d 8, 11 (1st Cir.1986), and is inconsistent with two bedrock fundamentals of securities fraud law: (1) a market that internalizes and reflects all public information and (2) the standard of a diligent, active, and curious investor to which all would-be plaintiffs are held.

**6.** "The Boxer", ©1969 Paul Simon. The complete verse is:

**7.** Fraud on the market, as alleged here, requires that: (1) the misrepresentations were public; (2) the shares were traded on an efficient market; and (3) the plaintiff traded shares between the time the misrepresentations were made and the time the truth was revealed. *Basic, Inc. v. Levinson,* 485 U.S. 224, 248, n. 27, 108 S.Ct. 978, 992 n. 27, 99 L.Ed.2d 194 (1988). It is undisputed that Plaintiffs have met these particular pleading requirements.

**2. *Plaintiffs Have Failed to Adequately Plead a Securities Fraud Case.***

Generally, a plaintiff alleging any type of fraud must meet the pleading standards of Fed.R.Civ.P. 9(b). This rule requires that "[i]n all averments of fraud or intent, the circumstances constituting fraud or mistake shall be stated with particularity." The Sixth Circuit has held that this requirement is met when a fraud claim:

> specifies the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud.

*Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988).

However, in the recently enacted Private Securities Litigation Reform Act ("PSLRA"), Pub.L. No. 104–67, which amends the Exchange Act, Congress provides that a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

Plaintiffs' contend, though, that the Court should not apply the PSLRA to this case because the conduct at issue occurred prior to December 22, 1995. The Court finds this argument wholly unpersuasive as the PSLRA states specifically that:

> The amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, *commenced before and pending on* the effective date of this Act [, December 22, 1995].

PSLRA, Pub.L. No. 104–67, § 108, 109 Stat. 737, 758 (1995) (*emphasis* added). There is, therefore, no indication that the law should not apply to *conduct* occurring prior to the effective date, although Congress could (and no doubt would) have specified this had it so intended.

Nevertheless, Plaintiffs attempt to circumvent this plain language in two ways. First, they point to *District 65 v. Prudential Securities,* 925 F.Supp. 1551 (N.D.Ga.1996) and *Prudential Secs. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68 (S.D.N.Y.1996), as standing for the proposition that the PSLRA should not apply to securities fraud cases like the instant matter. This suggestion is not well-taken. Both of those cases arise under RICO, a statute which is not mentioned in the PSLRA applicability provision and, more importantly, both cases were filed before December 22, 1995.

Second, Plaintiffs argue that the Court must apply *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and find that while the procedural provisions of the PSLRA might apply, the substantive ones do not. This argument, however, plainly fails under *Landgraf* itself. Specifically, in *Landgraf,* the Supreme Court announced a two-step test to resolve the question of a statute's retroactivity. First, "when a case implicates a federal statute enacted after the events in suit, the ... court[s] [must] determine whether Congress has expressly prescribed the statute's proper reach." 511 U.S. at 280, 114 S.Ct. at 1505. If it has, the inquiry ends there. *Id.* However, if "the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* Here, Congress has expressly provided that the PSLRA shall apply to all cases *filed* after December 22, 1995. Therefore, the Court rejects Plaintiffs' suggestion that the PSLRA is not fully applicable to this case in all respects, as the Complaint was filed on October 7, 1996.

Having disposed of Plaintiffs' retroactivity argument, the question then becomes how to apply this provision in conjunction with Fed.R.Civ.P. 9(b) and the Sixth Circuit's interpretation of that Rule. Plaintiffs contend that the Sixth Circuit's interpretation still con-

trols here. Defendants, however, argue that Fed.R.Civ.P. 9(b) must be read in tandem with § 78u–4(b)(1).

The focus of the parties dispute here is the legislative history for this particular provision. The Conference Report for the PSLRA states the following:

## REQUIREMENTS FOR SECURITIES FRAUD ACTIONS

*Heightened pleading standard*

Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with "particularity." The Rule has not prevented abuse of securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits. The House and Senate hearings on securities litigation reform included testimony on the need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits.

The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform to the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard. [FN 23] The plaintiff must also specifically plead with particularity each statement alleged to have been misleading. The reason or reasons why the statement is misleading must also be set forth in the complaint in detail. If an allegation is made on information and belief, the plaintiff must state with particu-

larity all facts in the plaintiff's possession on which the belief is formed.

\*     \*     \*     \*     \*     \*

[FN 23]  For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess., 41 (1995), *reprinted in* 1995 U.S.Code Cong. & Ad. News ("U.S.C.C.A.N.") 730, 740.

On the face of both the statute and the legislative history, § 78u–4(b)(1) does nothing more than expand existing Fed. R.Civ.P. 9(b) pleading requirements. Thus, the Court finds that it must read together § 78u–4(b)(1) and the Sixth Circuit's Fed. R.Civ.P. 9(b) jurisprudence. Accordingly, the Court will examine Plaintiffs' Complaint to determine if it specifies:

(1) the parties and the participants to the alleged fraud;

(2) the time, place and content of the representations;

(3) each statement alleged to have been misleading;

(4) the reason or reasons why the statement is misleading;

(5) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed;

(6) the fraudulent scheme;

(7) the fraudulent intent of the defendants;

(8) reliance on the fraud; and

(9) the injury resulting from the fraud.

*Cf. Michaels Building Co., supra,* 848 F.2d at 679 *with* 15 U.S.C. § 78u–4 (b)(1).

### a. *Failure to Plead Fraud with Particularity.*

In ¶¶ 32–50 and 53–55, Plaintiffs' Complaint lists a series of long block quotes from various research reports, press releases, and corporate documents under a heading of "False Statements During the Class Period." Thereafter, Plaintiffs' Complaint states:

The positive statements detailed in ¶¶ 32–50 and 53–55 about Network Express'

business, products and prospects were false and misleading when made and failed to disclose the following material adverse information, which was known only to Network Express' insiders due to their access to internal corporate data:

(a) [NEI] really had only one source of business in Japan of any significance, the NTT contract with is Japanese distributor, Soliton, and that its revenues from Japan would drop off sharply in the fourth quarter of 1995, and be cut at least in half in 1996, which would have a materially adverse impact on [NEI]'s results;

(b) That [NEI]'s prospects for continued revenue from Japan after the NTT contract was completed were virtually nill because it had no contracts or significant business prospects beyond the NTT contract;

(c) That [NEI]'s plans for revenue and income growth during 1996 depended upon achieving large sales of its new NELink 1000 InterHub product in Japan and the United States; however, due to design deficiencies and manufacturing problems, [NEI]'s NELink 1000 product lacked a critical performance capability, i.e., remote access, that was necessary for the product to achieve commercial success and thus sales of the product were poor and well below the levels internally budgeted or forecasted by [NEI] and necessary for [NEI] to achieve the levels of revenue and earning growth being forecast by and for it;

(d) That [NEI]'s products were achieving very little sales success in the United States and that these weak sales, combined with the problems with the NELink 1000 product, meant that [NEI]'s sales in the United States were stagnating at low levels without any real prospect of significant growth;

(e) That [NEI]'s products were not achieving any commercial success in Europe and that problem, together with the problems affecting the NELink 1000 product, meant that [NEI]'s revenues from Europe were stagnating at low levels and did not have any reasonable probability of significant growth in the foreseeable future;

(f) That [NEI]'s test work with Pacific Bell was such that there was virtually no probability of significant commercial revenue being obtained from those activities or relationships with the [R]egional Bell Operating Companies in the foreseeable future;

(g) That in order to artificially boost its first and second quarter 1995 reported net income and earnings per share, [NEI] had pre-shipped or advanced-shipped certain products to Soliton, its distributor in Japan, for use in the NTT contract, even though the product shipped at the time it was shipped was not needed until the succeeding quarter, thus resulting in an artificial revenue inflation in the quarter in which the pre-shipment took place, which [NEI] knew would result in an even sharper drop-off in sales in Japan in the fourth quarter of 1995 than would otherwise have been the case;

(h) That [NEI] did not have the adequate engineering or manufacturing capabilities and quality control programs that it emphasized in its public disclosures and, in fact, due to engineering shortcomings and manufacturing problems, [NEI]'s most important product, NELink 1000, did not have performing remote access capability, which was a capability that was indispensable for commercial success of the product;

(i) That, as a result of the foregoing, the forecasts and projections made by and for [NEI] by the [D]efendants of strong revenue growth in the United States and Europe during 1995 and 1996 and for continued strong revenues from Japan during 1996 had no reasonable basis in fact and were, in fact, contradicted by the adverse facts and conditions afflicting [NEI]'s business as specified above, which were known only to [NEI] and its insiders and the other Defendants named in this action and thus those projections and forecasts were

not genuinely believed by the Defendants; and

(j) As a result of the foregoing, the forecasts and projections made by and for [NEI] by the Defendants of strong revenue growth in the United States and Europe during 1995 and 1996 and for continued strong revenues from Japan during 1996, leading to 1995 and 1996 earnings per share of $.24–$.26 and $.37–$38, respectively—had no reasonable basis in fact and were, in fact, contradicted by the adverse facts and conditions afflicting [NEI]'s business as specified above, which were known only to [NEI] and its insiders and the other Defendants named in this action and thus those projections and forecasts were not genuinely believed by the [D]efendants.

\* \* \* \* \* \*

Plaintiffs, by and through [P]laintiffs' attorneys, allege the following on the investigation made by and through Plaintiffs' attorneys, which investigation included, without limitation, a review and analysis of various articles, research reports, "First Call" print-outs about the public filings of [NEI], and consultation with financial and accounting experts. Plaintiffs believe that, after a reasonable opportunity for discovery, substantial evidentiary support will exist for the[se] allegations.

(Complaint, ¶¶ 56, 77).

█ The Court finds that these allegations and the manner in which they are pled plainly fail to meet the particularity requirements that the Court has identified. Under § 78u–4(b)(1), Plaintiffs must specify each statement alleged to have been misleading; the reason or reasons why the statement is misleading; and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Nowhere in the Complaint do Plaintiffs specify each statement that is allegedly false nor do they give a particular reason why a particular statement is false. Rather, they have simply complied a long list of block quotes, many of which contain statements that cannot seriously be regarded as false or misleading, and they line these statements up against a conclusory list of omissions and pronounce that fraud exists. Any notion of particularity and an underlying reason in light of the PSLRA certainly demands more than this.

Moreover, where a plaintiff makes an allegation of fraud regarding a statement or omission based on information and belief, he or she has the responsibility of explaining with particularity all facts on which that belief is formed. Here, Plaintiffs merely state that they,

by and through [their] attorneys, allege the following on the investigation made by and through [their] attorneys, which investigation included, without limitation, a review and analysis of various articles, research reports, "First Call" print-outs about the public filings of [NEI], and consultation with financial and accounting experts. Plaintiffs believe that, after a reasonable opportunity for discovery, substantial evidentiary support will exist for the[se] allegations.

(Complaint, ¶ 77). This conclusory and vague paragraph fails to conform to any notion of particularity or factual nexus. Plaintiffs must provide a particular factual basis for their belief that a particular statement or omission is false or misleading. Plaintiffs have simply failed to meet this standard because their Complaint simply says that the statements in ¶¶ 32–50 and 53–55 are false and that the generalizations in ¶ 56 are omissions.

In summary, the law now requires a plaintiff to draw a specific nexus between the allegedly fraudulent statements and the facts upon which the allegation of fraud is dependent, or, at least, a clear statement of why and how the plaintiff has reached the conclusion that a particular statement is fraudulent. Therefore, because Plaintiffs' Complaint falls far short of this standard, the Court finds that it must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A) (if requirements of § 78u–4(b)(1) are not met, complaint must be dismissed); *Jackson National Life Insurance Company, supra,* 32 F.3d at 703 (Section 20(a) claims

must be dismissed where the predicate Section 10(b) and Rule 10b–5 claims are dismissed).

### b. *Failure to Plead Scienter.*

Plaintiffs' Complaint is also insufficient because it fails to properly plead scienter. Specifically, the PSLRA has a provision adopting the following state of mind requirement for securities cases:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1). The same legislative history quoted above is also relevant to this provision:

### REQUIREMENTS FOR SECURITIES FRAUD ACTIONS

*Heightened pleading standard*

Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with "particularity." The Rule has not prevented abuse of securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits. *The House and Senate hearings on securities litigation reform included testimony on the need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits.*

The Conference Committee language is based *in part* on the pleading standard of the Second Circuit. The standard also is specifically written to conform to the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. *Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.* [FN 23] The plaintiff must also specifically plead with particularity each statement alleged to have been misleading. The reason or reasons why the statement is misleading must also be set forth in the complaint in detail. If an allegation is made on information and belief, the plaintiff must state with particularity all facts in the plaintiff's possession on which the belief is formed.

\*    \*    \*    \*    \*    \*

[FN 23] *For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.*

H.R. Conf. Rep. No. 104–369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 740 (*emphasis* added).

Relying on § 78u–4(b)(1) and the associated legislative history, Defendants argue that Plaintiffs must plead facts with particularity which create a strong inference of a conscious fraudulent intent. Plaintiffs, however, assert that the statute, as indicated by some members' floor statements, does nothing more than adopt the Second Circuit standard of pleading with particularity facts which create a strong inference of fraudulent intent, including: (1) showing a motive and opportunity for committing fraud or (2) circumstantial evidence of either reckless or conscious behavior. *See, In re Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 268–69 (2d Cir.1993).

Plaintiffs' argument, however, is directly refuted by the Conference Committee Report, which is the most reliable and authoritative source for Congressional intent and legislative history. *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969)) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen in-

volved in drafting and studying proposed legislation'"); *RTC v. Gallagher,* 10 F.3d 416, 421 (7th Cir.1993) (The Conference Report "is the most persuasive evidence of congressional intent besides the statute itself"). *In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988) (Committee reports, not "[s]tray comments by individual legislators," provide the best expression of legislative intent). *See also Landgraf v. USI Film Products,* 511 U.S. 244, 263 n. 15, 114 S.Ct. 1483, 1496 n. 15, 128 L.Ed.2d 229 (1994) ("a court would be well advised to take with a large grain of salt floor debate and statements placed in the Congressional Record which purport to create an interpretation for the legislation that is before us"). In particular, the Conference Report plainly states that

> [b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard ... For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

H.R. Conf. Rep. No. 104–369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 740. Indeed, the force of this language did not escape President Clinton, who, when vetoing the bill (which was subsequently overridden), stated that:

> I am prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

H.R. Doc. No. 150, 104th Cong., 1st Sess. at .1 (1995).

▮▮▮▮ Therefore, based on the plain language of § 78u–4(b)(1) and the Conference Committee Report, the Court finds that securities fraud plaintiffs must plead with particularity facts giving rise to a strong inference that the defendant(s) acted with fraudulent intent. Reviewing Plaintiffs' Complaint, the only allegations which even arguably suggest fraudulent intent are: (1)

the NEI Defendants' sale of stock in August, when the stock reached an all-time high; and (2) the Underwriters' on-going relationship with NEI.

The inference with respect to the insider sales, however, is rebutted by the fact that the NEI Defendants retained vast holdings of NEI stock (Kinnear 85%, Hartmann 81%, Sullivan 75%, Swanson 68%, Eidswick, 80%). As for the Underwriters' on-going business relationship with NEI, it is well-established, even under the less strict motive/opportunity case law, that allegations regarding an underwriter's pursuit of fees and prestige is not sufficient to create an inference of scienter. *Melder v. Morris,* 27 F.3d 1097, 1102–04 (5th Cir.1994); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994) (same). Therefore, without anything more than these bare allegations and circumstances, the Court finds that Plaintiffs' Section 10(b) and Rule 10b–5 claims should also be dismissed for failure to adequately plead scienter. Necessarily then, the Section 20(a) claims are also dismissed. *Jackson National Life Insurance Company, supra,* 32 F.3d at 703.

> In summary, the Court finds that:
>
> (1) Plaintiffs' Complaint is barred by the statute of limitations because Plaintiffs were on inquiry notice of the risks and circumstances underlying their Complaint prior to October 1995, yet they failed to make any reasonable and diligent investigation;
>
> (2) Plaintiffs' Complaint fails to adequately plead fraud with particularity under the PSLRA; and
>
> (3) Plaintiffs' Complaint fails to adequately plead scienter under the PSLRA.

## IV.  CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.